L. O. KEEDICK, APPELLANT, V. EDWARD J. BROGAN, APPELLEE AND CROSS-APPELLANT: FEDERAL LAND BANK OF OMAHA, APPELLEE.

FILED JANUARY 24, 1928.   No. 25351.

(339)

*Courtright, Sidner, Lee & Gunderson,* and *McIntosh & Martin,* for appellant.

*Dolezal, Spear & Mapes, J. J. Gleeson* and *J. C. Cook,* for cross-appellant.

*E. F. Dougherty, J. L. Cutright* and *E. J. Robins, contra.*

Heard before Goss, C. J., Rose, Dean, Good, Thompson, Eberly and Howell, JJ., and Redick, District Judge.

Goss, C. J.

This is a suit by plaintiff to foreclose a real estate mortgage. Federal Land Bank of Omaha intervened to foreclose its mortgage. From a decree adverse to plaintiff, he appeals.

Neither the appellant nor Edward J. Brogan, the defendant, now appellee, questions, in brief or in oral argument, the decree in favor of the Federal Land Bank, in which the court found that the bank obtained its mortgage in good faith without notice or knowledge of any mental infirmity or incapacity of Brogan and that the sum of $8,000 was actually paid by the intervener to him.

Edward J. Brogan was the owner of 120 acres of land, free from incumbrance, in Dodge county. When he made application for the loan from the Federal Land Bank July 19, 1921, he recited that he was 45 years old, a widower for three years, and lived on the land with his five boys, ranging from 8 to 21, and with his two girls, ranging from 3 to 16 years of age. In 1917 he had bought 160 acres near Julesburg in eastern Colorado. This was only partly paid for. In the summer of 1920 he was induced by the Bentley Land Company, which had offices in Sidney, Ne-

braska, and in Burlington, Colorado, to go to Colorado to look at land with a view of buying more. His 20-year-old son, James, accompanied him. On August 24, 1920, he signed two contracts of purchase of land, one for 160 acres and one for 320 acres. He paid no money, but for the quarter section he agreed to pay $90 an acre or $14,400 in payments described; and for the half section he agreed to pay $77.50 an acre or $24,800, of which $600 in Liberty bonds were to be forwarded to Bentley Land Company at once and the remainder in payments described. He then returned to his home at North Bend, taking with him the duplicate copies of his contracts. J. A. Bentley, the president of the land company, testified he told Brogan he did not own the quarter section and did not know whether he could deliver it but had it listed and perhaps could. On August 28 the company wrote Brogan a letter, returning the two notes given by him on the quarter section contract, saying they were unable to deliver it at the price and that they had marked the contract as canceled. The letter stated that they had not yet received the Liberty bonds. Brogan took the letter and contract to his attorney and on August 30 the attorney wrote the company that Brogan would not consent to the cancelation and forwarded the Liberty bonds to the company to apply on the contract for the half section. After some further fruitless correspondence, Brogan employed a Fremont lawyer and brought suit for damages against the company at Sidney for breach of contract; but on March 1, 1921, the matter was compromised by the parties entering into a contract by which the company sold Brogan a different quarter section at $82.50 an acre or $13,200 and he agreed to give a first mortgage on his Dodge county farm for $6,600 and a like mortgage on the Colorado land. The damage suit was dismissed and the mortgage on the Dodge county farm was executed April 20, 1921, and recorded. During the next year the record shows that Brogan was seeking an advantageous sale of his home farm or a large loan to relieve himself of financial pressure. April 24, 1922, he mortgaged

this land to the Federal Land Bank for $8,000 as a first lien and gave a new mortgage, acknowledged June 29, 1922, as a second lien, to J. A. Bentley for $13,297, subject to the Federal Land Bank mortgage. On June 20, 1922, Bentley assigned this mortgage and the note secured thereby to plaintiff. On June 7, 1923, the county court of Dodge county made an order appointing Brogan's sister, Catherine Langdon, his guardian, on the ground of mental weakness, but for some reason the letters of guardianship were not issued to her until November 28, 1924. As such guardian she appeared for him in this suit.

The answer of the guardian alleged the incompetency of Edward J. Brogan during all the transactions referred to; alleged that Bentley procured his intoxication and overreached Brogan in the matter of the sale of the Colorado lands; that Keedick is a brother-in-law of Bentley and had knowledge of the premises and aided Bentley to contrive to defraud Brogan, and that plaintiff is not an innocent purchaser.

According to the record, the trial began December 21, 1926 (probably intended for 1925) and ended January 23, 1926. In the decree the court found that at and before the times in issue Brogan was mentally weak and incompetent to enter into the transactions with Bentley, and that Bentley and his land company caused him to be intoxicated and by undue influence induced him to enter into the contracts and to execute the note and mortgage sued on, and that ever since the time of the transactions Brogan has been incompetent to ratify the transactions or to waive the fraud practiced upon him, and that plaintiff is not an innocent purchaser. The decree found that the Federal Land Bank mortgage was obtained in good faith for value and that the $8,000 was actually paid to Brogan.

The question of intoxication at the time of the inception of the dealings between Bentley Land Company and Brogan does not seem to be very controlling or important in view of these facts which we find from the record to be facts: Brogan had been a farmer all his life; he was not

unfamiliar with Colorado land, having owned land there since 1917; shortly after his return from the trip in question he refused to yield to Bentley's written request to cancel one of the contracts, and was advised therein, and his correspondence was conducted, by a lawyer whose letters indicate that he must have received his data from a then sober man; later another lawyer brought suit in Sidney for damages for breach of the same contract, obtained for Brogan a satisfactory adjustment of controversies, and it may well be said that, if it was then apparent to sober and reasonable men that the repudiation of the Colorado transactions should be sought on account of intoxication of Brogan, it would have been done then and there; there are in the record several letters written in his own hand as well as details of other acts by him strongly corroborating knowledge of what he had done, at a time it is now claimed he was intoxicated; and at least in 1920 and 1922 he went out in person and with others harvested the grain grown on the Colorado land. These facts are definitely indicative of ratification as against the plea of intoxication. Where one is so intoxicated as to be so far deprived of his reason and understanding as to render him incapable of understanding the character and consequences of his act, he is defined to be excessively intoxicated. "To avoid a contract on the ground of excessive intoxication, one must rescind the contract within a reasonable time after recovering his senses." *Case Threshing Machine Co. v. Myers*, 78 Neb. 685; *Johnson v. Harmon*, 94 U. S. 371. We think the court erred in holding that the dealings between Bentley and Brogan should be voided by reason of intoxication. Brogan failed to prove the necessary facts by a preponderance of the evidence and he ratified and failed to rescind the contracts when sober.

As to the defense of incompetency, this must be considered in the light of the following well-established rules of law. Where it is sought to cancel an instrument for the want of mental capacity of the grantor to make the instrument, the burden of proof is on the one who alleges the

mental incapacity. *Brugman v. Brugman,* 93 Neb. 408, *Clark v. Holmes,* 109 Neb. 213. In determining the mental capacity of the grantor to execute an instrument, unless it appears that when the instrument was executed the grantor lacked the capacity to understand what he was doing, did not know the nature and extent of the property dealt with and what he proposed to do with it and lacked the capacity to decide intelligently whether or not he desired to make the conveyance, it cannot be said that he was incompetent to execute the instrument. *Brugman v. Brugman, supra; Clark v. Holmes, supra; Schley v. Horan,* 82 Neb. 704; *West v. West,* 84 Neb. 169.

Guided by those well-recognized principles, we have read the voluminous record and have studied the briefs to see where the truth lies in pursuance of our duty to try the case *de novo.* We have sought to find in the evidence the sure foundations for the decree of the trial court finding that Brogan was mentally incompetent at the time of the transactions. The court filed a memorandum opinion in which he said that the fact that Brogan was a mere child mentally became evident from the time he gave his testimony. From this brief mention he proceeds to the subject of his intoxication. While we do not have the opportunity to see the witness as did the trial court, yet it should be noted that his mental capacity is to be tested as of the date the transactions occurred and by what he said and did then, rather than years afterwards on the trial. It would have aided us in our investigation of this particular branch of the subject if the court or counsel for appellee in their brief had specifically pointed out such convincing evidences of mental incapacity as would support the memorandum opinion and the decree and sustain the burden of proof. We have perused the evidence of their witnesses showing him to be an improvident farmer and that he overbought machinery and supplies, that he mumbles to himself, talks in his sleep, gets up in the night and walks around, does little farm work except in the garden, sometimes for days would not talk to his family, slept out in

the car for a time, had sunstroke twice and the flu once, and would ask the boys, when having insurance written, the number of rooms in the house and the number of animals (no disclosure as to whether he was then intoxicated). One witness, described as one of the leading alienists of the state, testified to two examinations and tests of Brogan, beginning about nine months prior to the trial, and assigned Brogan "the mental age of a child of eight years and eight months." This witness, in answer to a hypothetical question, objected to because not reflecting the testimony, expressed the opinion that Brogan was incompetent and had been so for ten years. On cross-examination this expert frankly admitted that he knew he was testing Brogan as to his competency in connection with the land transaction in controversy and that he assumed Brogan knew it because he asked him about it; admitted that it would make some difference if it was proved that he wrote coherent letters and furnished coherent, detailed information as to his financial affairs to another; admitted that his condition indicated that he was progressively worse mentally, and conceded that his opinion, expressed on direct examination, was influenced by the history of alcoholism. Another witness, who is a general physician, likewise expressed the opinion, in answer to the hypothetical question and from examinations of him, that he was incompetent.

Aside from the so-called expert opinions, the other witnesses in ultimate effect indicated qualities in Brogan either that inhere in many sane men, or that are found in improvident men, or characteristics disclosed by men who are affected temporarily by the influences of liquor. Several of these witnesses are the children of Brogan, who were not disinterested witnesses. The value of their testimony is diminished, if not discredited, by the fact that on April 11, 1921, they petitioned the county court of Dodge county to appoint Edward J. Brogan their guardian to care for their property in Nebraska and Colorado; and on the same day he was, on their petition, found to be "a

suitable person to act as such guardian," was appointed, gave bond and received his letters of guardianship. The letters written by Brogan were coherent, and the testimony of the agent for the Surety National Farm Loan Association of Dodge, through whom Brogan arranged the $8,000 loan held by the Federal Land Bank and who dealt with and for Brogan in getting the Bentley claims rearranged, shows that Brogan was perfectly competent and rather clever for a man of his opportunities. Tested by the principles usually applied, we are of the opinion that the representative of Brogan has not sustained the burden of proving Brogan incompetent, and that the court erred in that respect as it did in the finding as to his intoxication.

It follows that it is immaterial whether plaintiff is an innocent purchaser, that he is entitled to a lien for the amount of his mortgage debt, and that the lien of the Federal Land Bank is further and more fully confirmed, on all legal and equitable grounds, than it was by the court's decree and on the grounds upon which he allowed it.

The judgment of the district court is affirmed as to the Federal Land Bank's first lien, and is reversed and remanded as to plaintiff, with directions to enter a decree for the plaintiff giving him a lien subject only to that of Federal Land Bank.

AFFIRMED IN PART, AND REVERSED IN PART.

Note—See Contracts, 54 L.R.A. 440; 2 L.R.A. (n.s.) 666; 25 L.R.A. (n.s.) 596; L.R.A. 1915B, 1121—6 R.C.L. 595; 2 R.C.L. Supp. 160; 6 R.C.L. Supp. 399—13 C. J. 757, n. 27.