RICHARD B. MARSTON ET AL., APPELLANTS, v. MARVIN DROBNY ET AL., APPELLEES.

90 N. W. 2d 408

Filed June 6, 1958. No. 34326.

*Hutton & Hutton,* for appellants.

*William W. Griffin,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiffs, Richard B. Marston and Irene Marston, husband and wife, brought this action in equity against defendants, Marvin Drobny, Margaret Drobny, his wife, Otto Drobny, and Elkhorn Valley National Farm Loan Association, together with Lyle P. Dierks, its secretary-treasurer, and Ed Verzal, its assistant secretary-treasurer.

Plaintiffs' petition sought the cancellation of an agreement for a warranty deed to certain described farm lands; the cancellation of an escrow agreement providing for the holding and delivery of said deed; cancella-

tion of the deed itself, together with a quieting of title to the lands in plaintiffs; and the granting of equitable relief. Such relief was sought upon the alleged grounds that plaintiff, Richard B. Marston, was mentally incompetent at the time of the purported execution and delivery of the instruments and never acknowledged the agreement for a warranty deed although the land was plaintiffs' homestead; and that plaintiff, Irene Marston, was forced, by threats of her husband, to sign the agreement for a warranty deed and the deed itself, neither of which was ever acknowledged by her.

As far as important here, the answer and cross-petition of defendants, Marvin and Otto Drobny, denied generally and sought specific performance, together with equitable relief; and plaintiffs' reply was a general denial.

After a hearing on the merits, whereat voluminous evidence was adduced, a judgment was rendered which found and adjudged the issues generally against plaintiffs on their petition, and in favor of defendants Drobny upon their answer and cross-petition. It ordered plaintiffs to specifically perform and carry out the agreement for a warranty deed in all respects according to its terms. It ordered the other defendants to deliver the warranty deed held in escrow by them to defendants Drobny upon compliance by them with conditions of the escrow agreement, and ordered and required plaintiffs to account to defendants for the rents, income, and profits of the premises from January 2, 1957. Subsequently, plaintiffs' motion for new trial was overruled, and they appealed, assigning in substance that the judgment was not sustained by the evidence but was contrary thereto and contrary to law. We do not sustain the assignments.

Hereinafter Richard B. Marston will be called plaintiff. Irene Marston, his wife, will be called Irene, and when referring to both they will be called plaintiffs. Marvin and Otto Drobny will be respectively designated

by name or as defendants. The Elkhorn Valley National Farm Loan Association will be generally designated as such or called the association, and Lyle P. Dierks, its secretary-treasurer, and Ed Verzal, its assistant secretary-treasurer, will be so officially designated.

At the outset we point out that the pleadings do not raise any issue of fraud, undue influence, or overreaching by defendants, and no evidence was adduced which could directly or by inference support any such issues. In that connection also, any possible issue of inadequacy of consideration was eliminated from consideration by the court in conformity with a stipulation of the parties proposed by plaintiffs' attorneys.

There are well-established rules applicable and controlling in cases presenting issues such as that at bar. They are as follows: "Actions in equity, on appeal to this court, are triable de novo, subject, however, to the rule that when * * * evidence on material questions of fact is in irreconcilable conflict, this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying, and must have adopted one version of the facts rather than the opposite.

"The general rule is that, in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction, are, in the eyes of the law, one instrument, and will be read and construed together as if they were as much one in form as they are in substance." Pike v. Triska, 165 Neb. 104, 84 N. W. 2d 311.

In Keedick v. Brogan, 116 Neb. 339, 217 N. W. 583, citing Brugman v. Brugman, 93 Neb. 408, 140 N. W. 781, this court held: "Where it is sought to cancel an instrument for the want of mental capacity of the grantor to make it, the burden of proof is on the one who alleges the mental incapacity.

"In determining the mental capacity of the grantor to

execute an instrument, if it clearly appears that when the instrument was executed the grantor had the capacity to understand what he was doing, knew the nature and extent of the property dealt with and what he proposed to do with it, and had the capacity to decide intelligently whether or not he intended to make the conveyance, it cannot be said that he was incompetent to execute the instrument." See, also, John Hancock Mutual Life Ins. Co. v. Harrold, 130 Neb. 23, 263 N. W. 598.

In Kucaba v. Kucaba, 146 Neb. 116, 18 N. W. 2d 645, we also held: "To set aside a deed on the ground of want of mental capacity on the part of the grantor, it must be clearly established that the mind of the grantor was so weak or unbalanced at the time of the execution of the deed that he would not understand and comprehend the purport and effect of what he was then doing."

As said in that opinion: " 'It is not every weakness of mind arising from old age or sickness, or other causes, that will avoid a deed. There must be a total want of reason or understanding. * * * Mere mental weakness will not authorize a court of equity to set aside an executed contract. * * * In order to vacate a deed on the ground of mental incapacity of the grantor, it is necessary to show such a degree of mental weakness as renders the maker of the deed incapable of understanding and protecting his own interest. The mere circumstance that the mental powers have been somewhat impaired by age or disease is not sufficient, if the maker of the deed still retains a full comprehension of the meaning, design and effect of his act, * * *.' Brugman v. Brugman, 93 Neb. 408, 140 N. W. 781."

In Parkening v. Haffke, 153 Neb. 678, 46 N. W. 117, we also held: "In order to invalidate a deed on the ground of mental incapacity on the part of the grantor it is necessary to show such a degree of mental weakness as renders the maker of the deed incapable of understanding and protecting his own interests." See,

also, Smith v. Black, 143 Neb. 244, 9 N. W. 2d 193.

In that connection, the question of mental competency of one who executes an instrument relates exclusively to the time when the instrument was executed. Although competent evidence of a condition of mind long before, closely approaching, and shortly after the time of its execution is admissible, it is received only to assist in revealing a state of mind at that time. It must also appear that a witness, lay or expert, in giving his opinion as to mental competency to execute an instrument had in mind the quality of mental capacity essential to the execution thereof. In re Estate of Inda, 146 Neb. 179, 19 N. W. 2d 37.

Also, as held in Teresi v. Filley, 146 Neb. 797, 21 N. W. 2d 699: "Triers of fact are not compelled to accept as absolute verity every statement of a witness not contradicted by direct evidence. Circumstantial evidence is equally competent with direct testimony. The relative convincing powers of the two classes of evidence are for the determination of the triers of fact.

"Evidence not directly contradicted is not necessarily binding on the triers of fact, and may be given no weight where it is inherently improbable, unreasonable, self-contradictory, or inconsistent with facts or circumstances in evidence.

"Triers of fact have the right to test the credibility of witnesses by their self-interest and to weigh undisputed parol testimony against facts and circumstances in evidence from which a conclusion may properly be drawn that the parol testimony is false."

This court also held in Williams v. Watson Bros. Transp. Co., 145 Neb. 466, 16 N. W. 2d 199: "The value of the opinion of an expert witness is dependent on, and is no stronger than, the facts on which it is predicated. The opinion has no probative force unless the premises upon which it is based are shown to be true." See, also, Hamilton v. Huebner, 146 Neb. 320, 19 N. W. 2d 552, 163 A. L. R. 1.

We turn then to the issue of alleged failure by plaintiff and Irene to acknowledge the contracts, and Irene's alleged failure to acknowledge the warranty deed. In Farmers Investment Co. v. O'Brien, 109 Neb. 19, 189 N. W. 291, thereafter cited with approval in Johnson v. Kelley, 112 Neb. 60, 198 N. W. 567, and Marodolac v. Uhe, 113 Neb. 450, 203 N. W. 547, this court held: "A contract for the sale of homestead property signed by both husband and wife, though not acknowledged, when made at the same time with a warranty deed to the property, which deed they both execute, and duly acknowledge, and which is delivered in escrow, held to be a valid contract."

In Bode v. Jussen, 93 Neb. 482, 140 N. W. 768, citing Council Bluffs Savings Bank v. Smith, 59 Neb. 90, 80 N. W. 270, 80 Am. S. R. 669, this court held: " 'The certificate of an officer having authority to take acknowledgments cannot be impeached by showing merely that such officer's duty was irregularly performed.' " Such rule was reaffirmed in Fisher v. Standard Investment Co., 145 Neb. 80, 15 N. W. 2d 355.

In Trowbridge v. Bisson, 153 Neb. 389, 44 N. W. 2d 810, this court held: "In proceedings which involve only the rights of the parties to the transaction or other persons having notice of the facts, parol evidence is admissible to contradict the recitals of a notary certificate and show them to be false.

"In that connection, however, a certificate of acknowledgment in proper form can only be impeached by clear, satisfactory, and convincing evidence that its recitals are false, and the burden is ordinarily upon the party alleging the same to so prove it."

Also, as held in Kucaba v. Kucaba, *supra*: "Public policy forbids that deeds and mortgages of real estate, duly authenticated in the mode pointed out by statute, should be set aside except upon clear and convincing proof that the certificate of acknowledgment is false. The presumption is in favor of the certificate, and the

burden is upon the party alleging such a defense to prove it."

In the light of the foregoing rules, we have examined the evidence which can only be summarized here. In doing so, we believe that it established the following: Plaintiffs, as husband and wife, were the owners of 880 acres of farm land near Dorsey. An improved 720 acres thereof had been their home for many years. They had a son, Charles, who at times here involved was married, had two children of his own, and lived in a separate house on plaintiffs' land. The family had planned that Charles should farm the land with his father and that eventually it would be a home belonging to Charles. In February 1955, Charles returned from service in the United States Air Force, moved into the separate house located about 200 feet from plaintiffs, and farmed with his father that year and until August 1956. As previously planned, he then left to attend the University of Nebraska to complete his engineering education under G. I. benefits, before the time to take advantage thereof under the law had expired. In the meantime, Charles had taken G. I. training at O'Neill, and during that period was at home only about 2 nights a week.

Prior to and at the time of the transactions involved, Charles and his father had a dry crop year, and plaintiff was indebted some $20,000. His land irrigation system was not working properly, his wife was ill with heart trouble, his son Charles was leaving to complete his education, plaintiff was growing older and not able to farm the place alone, so for such reasons as given by plaintiff repeatedly, he decided to sell the 720-acre farm and personal property, but retain the other quarter section of land. Therefore, on the morning of May 16, 1956, plaintiff drove his car over to defendant Marvin Drobny's home where he lived on an adjoining farm. Marvin and Otto Drobny were brothers who owned some land and worked together, but did not live on the same

place. They were both old friends and neighbors of plaintiffs and had changed work with them at numerous times. That morning plaintiff told Marvin that he wanted to sell his farm, and asked if defendants would be interested in purchasing it. Marvin told plaintiff he did not know, but he would see Otto about it. Such sale was discussed by plaintiff and both defendants on one or two other occasions, and again on May 22, 1956, at which time defendants were interested and wanted to inspect plaintiffs' farm. On that date, defendants and their father went to plaintiffs' home where, with the direction and assistance of plaintiff and his son Charles, they inspected the improvements and drove out over plaintiffs' farm. During that inspection plaintiff told defendants that insurance on the buildings would expire June 1, 1956, and they would have to take care of that, which was done thereafter with the assistance of plaintiffs and an insurance agent. During such inspection, plaintiff pointed out to defendants the land boundaries, described the types of soil, enumerated the kinds of crops generally raised thereon, and explained the operation of plaintiffs' irrigation system.

Then and there, after going over the matter at length, defendants offered plaintiff $29,000 for the land, including plaintiffs' irrigation equipment, and $24,000 without it, the latter offer being preferable, and plaintiff accepted it. Thereupon it was agreed that on the morning of May 24, 1956, they would meet in O'Neill and execute a written contract of sale.

On that date, plaintiff, Charles, and defendants drove to O'Neill together for that purpose. On the way they all talked over the terms which should be included in the contract and talked about other matters as well. Upon arrival in O'Neill they went to the office of one Thorin, a real estate broker known to plaintiff, but with whom defendants were not acquainted. Plaintiff introduced them to Thorin, told Thorin that he was selling his farm to defendants, and asked Thorin to prepare a

contract of sale. While they were all present, they discussed the terms together, informed Thorin of their agreement with regard thereto, and, as requested and directed by plaintiff, Thorin typed and prepared a written contract for sale of the land to defendants, which contract was not signed at that time. They then left Thorin's office, but soon returned, at the insistence of plaintiff, to request the addition of a provision in the contract for a reservation of plaintiff's irrigation pump house, which was part of plaintiff's irrigation equipment theretofore reserved by plaintiff, but which had not been as clearly reserved in the contract as plaintiff desired. Thereupon Thorin included such reservation in the contract.

While negotiations for the sale were pending, plaintiff conferred with an accountant concerning the income tax consequences of the sale of his farm, and discussed the sale with the manager of the O'Neill Production Credit Association, of which plaintiff was a member and from whom he had borrowed money since 1943. Plaintiff also called upon the secretary-treasurer of the Elkhorn Valley National Farm Loan Association, a member of the Federal Land Bank system, and discussed his plan to sell the farm. Plaintiff also conferred with the assistant secretary-treasurer of that association about the same, seeking to determine if the defendant purchasers could assume the existing land bank mortgage on the land, and whether or how plaintiff could have such land bank mortgage released on the quarter section which he was not selling.

On May 24, 1956, the parties, including plaintiff, his son Charles, and defendants, went from Thorin's office to the office of the Elkhorn Valley National Farm Loan Association, where they met its assistant secretary-treasurer, and further inquiry was made concerning assumption of the mortgage aforesaid by defendants and other details of the transaction, including a release of the mortgage on the quarter section not sold by plain-

tiffs. Upon being advised that such assumption and release were possible, plaintiff filed an application for such release. Plaintiff and defendants then signed the original contract, and defendants gave plaintiff a check for $5,000 down payment, as provided in the contract. Thereupon, plaintiff applied that money to pay off plaintiffs' indebtedness to the Production Credit Association. Plaintiff's wife Irene was not present at signing of those contracts, and never signed same because they were subsequently replaced by new contracts prepared at plaintiff's request by plaintiffs' attorney, Elven A. Butterfield, who by agreement destroyed the old contracts in the presence of plaintiffs and defendants.

In that connection, on May 28, 1956, plaintiff, accompanied by a close friend and advisor for many years, consulted with plaintiffs' attorney about the original contract he had made and about income tax consequences if he sold his farm and personal property in the same year. As a result of that meeting and the advice given him thereat by plaintiffs' attorney, plaintiff decided that it would be advantageous for him to change the terms of the original contract with regard to payment dates. As advised to do so by plaintiffs' attorney, plaintiff then consulted with defendants about the advisability of such changes, and on June 4, 1956, plaintiff took defendants to the office of plaintiffs' attorney to discuss and clarify the matter. Defendants had no attorney of their own and were not then acquainted with plaintiffs' attorney, who was a close friend of plaintiffs and a first cousin of plaintiff's wife Irene. There, after introductions by plaintiff to plaintiffs' attorney, and explanations of the matter, it was then agreed that plaintiffs' attorney should rewrite the contract of sale and change the final payment dates from June 15, 1956, to January 2, 1957, in order to remove plaintiffs from a higher income tax bracket in 1956.

It was then agreed in the office of plaintiffs' attorney that he would so rewrite the contracts and prepare a

warranty deed, after which the parties would all meet in the Elkhorn National Farm Loan Association office in O'Neill on June 7, 1956, to complete execution of the new contracts and warranty deed, and place the papers in escrow with the association in order to conclude the transaction. Thus, on June 7, 1956, plaintiff, accompanied by his wife Irene, went to O'Neill where they met their attorney, and, with the contracts and warranty deed prepared by their attorney and in their possession, they sat visiting in plaintiffs' car parked in front of the association office. Thereupon defendants came up and got in plaintiffs' car where the parties visited briefly, and defendants were handed the new contracts and warranty deed, which they read over several times. The contract of sale then bore the signatures of plaintiffs, Richard B. Marston and Irene Marston, his wife, which were admittedly thereafter witnessed by the signature of plaintiffs' attorney, although they were not acknowledged by plaintiffs. The warranty deed then bore the signatures of grantors, Richard B. Marston and Irene Marston, his wife, which were admittedly thereafter witnessed by the signature of plaintiffs' attorney. On the back of the warranty deed there appeared the typed certificate of acknowledgment thereof by "Richard B. Marston and Irene Marston, husband and wife," in proper form.

The defendants thereupon signified their approval of the contracts and warranty deed, whereupon plaintiffs' attorney told plaintiff's wife Irene that he was through with her, that she was not needed anymore, and she could go uptown and do her shopping. Thereupon she left, and plaintiffs' attorney, plaintiff, and defendants went into the association office. There defendants each signed the contracts and an employee of the association signed as a witness thereof. Thereupon plaintiffs' attorney placed his signature on the agreement for a warranty deed as a witness of the signatures placed thereon by plaintiffs, placed his signature as notary public upon

the acknowledgment of the warranty deed, and stamped his official seal on such certificate of acknowledgment. In that connection, the signature of plaintiffs' attorney as a witness to plaintiffs' signatures on the contract, and his signature as notary public on the warranty deed, were evidently written at the same time, by the same pen, with light green ink. When that was done, plaintiffs' attorney, as agreed and requested by plaintiffs, placed one of the contracts, the warranty deed, and an escrow agreement theretofore executed, in the hands of the association, with directions to hold them in escrow until after January 2, 1957, at which time, upon compliance with the contracts, the warranty deed was to be turned over by the association to defendants.

Plaintiffs' attorney, plaintiff, and defendants then stepped out of the association office together, where they again met plaintiff's wife Irene. After visiting briefly there together, Irene said: "* * * now that its all over with I will have to look for a new home, * * * Now we are like a boll weevil, we are looking for a home." There also, as requested, plaintiffs' attorney tore up the old contracts in the presence of all the parties thereto.

Again on June 14, 1956, defendants, as requested by plaintiff, accompanied him to the association office in O'Neill, where at plaintiff's request defendants gave plaintiff a check for $1,300, which was immediately turned over to the association by plaintiff to apply upon the land bank mortgage, and for which plaintiffs obtained a release from that mortgage so far as it covered the quarter section which was not sold to defendants.

As summarized, the agreement for a warranty deed executed and delivered to the escrow holder on June 7, 1956, described the 720 acres which plaintiffs agreed to sell to defendants for a consideration of $24,000, with $5,000 payable upon signing of the contract (which had been paid on May 24, 1956). Therein defendants agreed to assume and pay the Federal Land Bank mortgage indebtedness then on the premises, the amount of which

was to be determined June 15, 1956. Plaintiffs agreed to pay the interest thereon to that date, and defendants agreed to pay the interest thereon after that date and pay the balance of the consideration on or soon after January 2, 1957, at which time plaintiffs agreed to convey the premises to defendants by warranty deed with an abstract brought up to date showing merchantable title in plaintiffs, with taxes for the year 1955 and all previous years paid. It was also agreed that plaintiffs could live upon and have a lease of the premises for the year ending March 1, 1957, and pay to defendants therefor as crop rent one-third of all crops grown, including grain and alfalfa, and plaintiffs agreed to pasture only their own livestock on the premises. That was all complied with in due time before this action was filed on December 28, 1956. It was agreed also that one 1,000-bushel steel grain bin, one 10 x 14 foot brooder house, and one 8 x 9 foot wash house, both on skids, one 16 x 12 foot irrigation pump house, one 1,000-gallon propane tank, one described irrigation pump, and all of plaintiffs' irrigation pipe, should be reserved by plaintiffs as their own personal property. It was also agreed that plaintiffs were to have first chance to rent the building site on the land after March 1, 1957, and that plaintiffs had a right to have the use of all pasture land during the 1956 season. It was further agreed that on or about June 15, 1956, the parties would determine the amount of the balance due on the Federal Land Bank mortgage and determine the amount of the unpaid balance on the contract which would be paid on delivery of the deed on or after January 2, 1957. The escrow agreement delivered to the association escrow holder on June 7, 1956, contained material conditions comparable with those in the agreement for a warranty deed as heretofore set forth.

In that connection, on January 2, 1957, defendants tendered to the association full performance of the agreement for a warranty deed and the escrow agreement,

but delivery of the warranty deed to defendants was refused by the escrow holder because of this pending litigation.

In the latter part of June 1956, plaintiff and his son Charles visited with a well-known friend and dealer in irrigation equipment for some 30 minutes. There plaintiff told the dealer he had sold his farm to defendants but they had not purchased his irrigation system, therefore he wanted the dealer to inspect it and make plaintiffs an offer for purchase of it. Thereafter, on July 2, 1956, the dealer inspected said system in the presence of plaintiff, his son Charles, and plaintiffs' son-in-law. After negotiating for about 3 hours, plaintiff agreed to sell plaintiffs' irrigation system for $5,250, and the dealer paid plaintiff $2,000 down on the purchase price. Thereafter, on July 18, 1956, such dealer paid plaintiff the balance of $3,250, and with the assistance of plaintiff and Charles, spent most of that day loading and removing plaintiffs' irrigation equipment, except the pump house which was not removed at that time. It was still on plaintiffs' farm during the early winter of 1956, at which time Charles asked the dealer whether he was still going to stop and remove the pump house which belonged to the dealer.

Plaintiff Irene admittedly signed the agreement for a warranty deed and the deed itself, but testified that she was forced to do so by threats of plaintiff, and that she never acknowledged the warranty deed. Admittedly, the agreement for a warranty deed was not acknowledged by plaintiffs, but, as heretofore observed, that would not be of serious legal consequence if plaintiff Irene acknowledged the warranty deed before plaintiffs' attorney was permitted to and did place the contract and warranty deed in escrow as requested and agreed. In that connection, if plaintiff was mentally competent, as we conclude, there is no contention that he did not voluntarily sign the agreement or acknowledge the warranty deed.

Irene's testimony that she was forced to sign the instruments was not only equivocal, self-contradictory, inherently improbable, unreasonable, and without any corroboration, but also there were many facts and circumstances appearing in this record in connection with the contract which justified the trial court, as it evidently did, in rejecting her testimony as false with regard to signing the instruments. Irene's like testimony that she never acknowledged the warranty deed was equivocally corroborated by plaintiffs' attorney, her first cousin, who, as a witness called by defendants, admittedly witnessed plaintiffs' signatures on the agreement and warranty deed, signed the acknowledgment as notary public, and placed his official seal thereon. In that connection, we believe this record shows that plaintiffs' attorney laid the groundwork for this litigation, commenced the action, and assisted in the trial thereof, until after decree was rendered July 20, 1957, wherein he still appeared as an attorney for plaintiffs. However, thereafter, on July 29, 1957, plaintiffs' attorney filed with the clerk of the district court a withdrawal purportedly dated May 11, 1957, the last day of the trial.

There are facts and circumstances in this record which would and did justify the trial court in rejecting as false the testimony of plaintiff Irene and plaintiffs' attorney that she did not acknowledge the warranty deed. We conclude that Irene was familiar with the entire transaction; was present at its termination; that she voluntarily signed the agreement and warranty deed; and that she voluntarily acknowledged the warranty deed, although the notarial officer's duty was irregularly performed. We conclude that there is no clear, satisfactory, and convincing proof that the acknowledgment was false.

The evidence upon the issue of mental competency at the time of the transaction was conflicting in material respects. However, material and competent evidence, some of which appears in evidence adduced by plain-

tiffs, clearly established that at the time of the transaction, prior thereto, and subsequently as well, except during part of the period from September 23, 1956, to November 6, 1956, while plaintiff was in a hospital in Omaha, plaintiff had the mental capacity to understand what he was doing, knew the nature and extent of his property and what he proposed to do with it, and was able to decide intelligently whether or not he desired to make the contract and conveyance.

Plaintiff's bank ledger sheets, showing deposits, withdrawals, and balances in his account from January 1956 to January 1957, appear in this record. Also, numerous paid checks drawn by plaintiff, through which he carried on his business transactions from January 1956 to September 15, 1956, inclusive, and also through November and December 1956, inclusive, appear in this record. Reference to each one independently would serve no purpose here. It is sufficient to say that an examination of such ledger account and checks supported by other uncontradicted evidence establishes that during such periods plaintiff himself carried on all of his personal farm and family business of every kind and made all decisions with regard thereto as usual, without being influenced or assisted by his family, except that he talked with his wife Irene, and his son Charles, about some transactions at times.

In that connection, the record discloses that on February 13, 1956, plaintiff filled out his income tax return in his own handwriting. During that month, he circulated petitions and participated in establishing a brucellosis control district in his area. On March 8, 1956, plaintiff assisted in the assessment of his own and other personal property, and signed a schedule for himself, his wife Irene, and his son Charles. In July 1956, plaintiff placed a portion of his land in the soil bank program, signed the necessary papers for that purpose, and thereafter was paid benefits exceeding $1,000. During July, he transacted a rental of his hay land on the

quarter section not sold to defendants. Also, during that month he sold his irrigation equipment after consulting with three dealers therein about it. On August 29, 1957, plaintiff gave his son Charles, who had or was entering the university, a check for $36.67, payable to Huskerville Housing Ofc., as September rent on a housing project. On September 8, 1956, plaintiff gave the county treasurer a check for $150.03 in payment of real estate taxes. On September 15, 1956, plaintiff gave a check for $829.85, as payment in full of the balance on a combine. In August and September 1956, plaintiff made arrangements for an auction of his livestock and machinery. Also, he was justice of the peace for Steel Creek township during 1956, and as such signed and approved several claims against the township for January, February, June, July, and October 1956.

During such periods, several of plaintiff's business acquaintances who testified at the trial saw him, visited with him, and transacted business with him. Except defendants, they were disinterested witnesses. For example, the manager of the Production Credit Association, of which plaintiff was a member and from whom he had borrowed money, visited with plaintiff in the early spring of 1956 and again on May 23, 1956, about the sale of plaintiffs' farm. He testified that plaintiff seemed nervous and dissatisfied with the results of his irrigation venture, but he saw nothing which indicated that plaintiff was mentally unbalanced or incompetent to transact business.

The real estate broker who, at plaintiff's request and with his assistance and direction, typed and prepared the first contract of sale, which was identical in material respects with the one subsequently prepared by plaintiffs' attorney except with regard to payment dates, testified that plaintiff appeared nervous but that he knew what he was doing, wanted to make the sale, and knew and understood the entire transaction; and that he neither saw nor suspected that there was anything

mentally wrong with plaintiff at that time. Defendants testified that at all times during the transactions plaintiff acted as he always had and did not do or say anything which indicated or led them to suspect that there was anything wrong with him mentally.

The party who originally sold plaintiff his irrigation equipment, and was well acquainted with him, visited with plaintiff in the spring of 1956 and again in June and July 1956. He testified that plaintiff appeared nervous and unsettled, but that plaintiff carried on an intelligent conversation, appeared to understand everything without difficulty, and said nothing and did nothing which would indicate that he was suffering from any mental illness. As a matter of fact, at that time such witness offered plaintiff a position as salesman for his firm.

The secretary-treasurer and assistant secretary-treasurer of the Elkhorn National Farm Loan Association, a branch of the Federal Land Bank which held the mortgage on plaintiffs' land assumed by defendants, and which released that mortgage from plaintiffs' quarter section not sold, had extensive contacts and dealings with plaintiff during and prior to the transaction in question. They testified that plaintiff seemed irritable, nervous, and upset, but plaintiff told them why he felt that way, and they did not consider it unusual under the circumstances. The assistant secretary-treasurer testified that plaintiff knew and understood all of the details of the transaction except that he once had some difficulty in understanding some intricate computation of figures in connection with releasing the quarter section from the mortgage, but that difficulty was not unusual because other persons sometimes had the same difficulty. They both testified that plaintiff did not do or say anything at any time which indicated that he was mentally incompetent, but without question was capable of transacting the business at hand.

The party who counseled with plaintiff in June 1956

about the purchase of his irrigation equipment and who purchased it in July 1956, testified that he felt that plaintiff was rational and competent to do business at that time; and that plaintiff was a good bargainer and did business in the same way as he always had.

On May 26, 1956, a close friend and advisor of plaintiff took him to a hospital in Lynch. The reason for doing so is not clear. Be that as it may, on May 28, 1956, that friend and advisor, who knew all the details of the sale, accompanied plaintiff to the office of plaintiffs' attorney, where the first contract was produced, and plaintiff was directed by plaintiffs' attorney to contact defendants and get permission to change the payment dates in order to put plaintiff in a lower income tax bracket for 1956. In that connection, plaintiffs' attorney did not testify that plaintiff was mentally incompetent at that time, or when the transaction was consummated, and plaintiff's close friend and advisor was not called as a witness for plaintiffs.

On September 23, 1956, plaintiff was taken to a hospital in Omaha where he was examined by two psychiatrists who diagnosed that he was mentally ill, with a depressive psychosis of a variable progressive nature, which tends to become severe over a period of months, but responds to proper treatment, although there may be recurrent attacks over the years. They believed plaintiff's attack had been slowly progressing over the last 8 or 9 months or longer. That opinion was based partly on what plaintiff told them, or what friends and members of plaintiff's family told them, plus their observation of plaintiff and his condition. Their opinion was that from about March 1956 or prior thereto, plaintiff did not have normal judgment and sound thinking in business matters, and during May 1956 plaintiff was mentally incompetent and should not have entered into any contract involving the sale of his land. Admittedly, however, at that time he did understand and know partly the legal effect of the contract, but he would not

be able to evaluate the true nature or wisdom of the contract, although to some degree he might have good days on which he would be relatively lucid and free from influence of his disease. They admitted that on May 24, 1956, plaintiff could have understood and known the legal effect and operation of a contract; and admitted that plaintiff then knew the members of his family and their relationship to him, the amount of land he owned, where it was located and its kind, its approximate market value, and could have reached a decision on his own that he desired to dispose of his property. Their idea was that plaintiff's decision was influenced more by an impelling motive caused by the disease rather than that he did not know what he was doing at the time. They admitted that if plaintiff had been more or less normal and only in the early stages of the disease in May and June 1956, then brooding over the sale of his farm and his family affairs could have been a major factor in plaintiff's rapid decline and condition in September 1956. In other words, they admitted that the exact condition of plaintiff's mind in May and June 1956 would be a subject of considerable conjecture.

It will be noted that the weight of such testimony was lessened by the equivocal and conjectural quality of plaintiff's purported mental capacity in May and June 1956, and the fact that neither physician had ever seen plaintiff before September 23, 1956, which necessitated that their conclusions with regard to his then mental condition would be based partly upon assumed facts related to them by others. The weight of their testimony was also lessened by facts, gleaned from letters and other evidence appearing in this record, which indicate that such physicians were called into the case for the dual purpose of not only treating plaintiff but also to help lay a foundation for this action. For example, on September 26, one such physician, apparently as solicited by plaintiffs' attorney, wrote plaintiff Irene a letter, saying: " 'Mr. Marston is suffering from a definite mental

illness and I suspect has been in it for some time.  I do hope that we can find out from the attorney whether or not legal action is possible before starting a definite treatment program.  Mr. Marston is in need of electric treatments, but I would like to know more about the legal aspects of things before going ahead with these.' " Also, on September 23, 1956, that same physician told Irene what she should do to get this case started, and to talk to her lawyer and see that it was pushed right along.  Thereupon, Irene talked to plaintiffs' attorney and told him to talk to the physician, which he did, and this action resulted.

In that connection, plaintiff testified as a witness for plaintiffs that he remembered nothing whatever of incidents that had occurred from the fall of 1955 until he returned from the hospital November 6, 1956.  However, the physicians aforesaid testified that such loss of memory was caused entirely by 10 electro-shock treatments given by them to plaintiff, which had restored him to his present normal mental condition, but as usual obliterated any memory of past events for several months.

If plaintiff were mentally incompetent in May and June 1956, when the contracts and warranty deed were executed and delivered in escrow, as claimed, and if that condition was as readily apparent as some of his friends, relatives, and family testified, then the actions of those who permitted and assisted with the transaction are entirely inconsistent with their testimony.  Plaintiff's family, friends, and legal advisors who so permitted and assisted him were adult, intelligent, and discerning people who knew the details of the transaction.  Their actions and attitude during the transactions contradict their testimony that plaintiff was then mentally incompetent.  Plaintiff's son Charles was one of those who accompanied his father, counseled with him during most of the transactions aforesaid, and knew every detail thereof.  He testified that he did not fully realize his father's

condition, and that because his father wished to sell, he assisted in order to help and humor him.

Plaintiff Irene knowingly accompanied plaintiff to O'Neill and met their attorney there on June 7, 1956, for the very purpose of completing the transaction. At that time, and prior thereto, it would have been extremely simple for Irene or plaintiffs' attorney to have stopped the sale if there had been any serious reason for her or plaintiffs' attorney to doubt plaintiff's mental competency. They made no effort to do so and the conclusion is inescapable that plaintiff was mentally competent.

For reasons heretofore stated, we conclude that the judgment of the trial court should be and hereby is affirmed. All costs are taxed to plaintiffs.

AFFIRMED.