BERNICE L. WERT, APPELLEE, V. EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, APPELLANT.

283 N. W. 506

FILED JANUARY 20, 1939. No. 30441.

*Brown, Fitch & West,* for appellant.

*Beghtol, Foe & Rankin,* contra.

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER and MESSMORE, JJ.

SIMMONS, C. J.

In this case the plaintiff, as beneficiary, sues to recover

$2,126, which she alleges is due her upon five contracts of retirement annuity insurance entered into between her deceased sister, Julia M. Wert, and the defendant.

The defendant claims that it has paid said indebtedness by its draft for said sum which was made payable to the plaintiff, delivered to, accepted and indorsed by the plaintiff, and honored and paid by the defendant.

The burden of proof was on the defendant. The action was tried to a jury. At the close of the evidence defendant moved for a directed verdict or a dismissal. The motion was overruled. The jury returned a verdict for the plaintiff in the sum of $2,628.99.

A motion for a new trial was made by the defendant, which was overruled.

Plaintiff moved for the allowance of an attorney's fee, which motion was sustained, and an attorney's fee of $700 was granted. The defendant then moved to set aside the order granting the attorney's fee and to retax the same, which motion was overruled.

The defendant's first assignment of error is: "The court erred in overruling defendant's motion for a directed verdict made at the close of all of the evidence." This requires an examination of the evidence. We mention herein the material facts about which there is a dispute.

The defendant called as a witness Charles E. Reilly, one of its Lincoln agents. Four months earlier plaintiff had attempted to take his deposition in this case, and on the advice of his counsel, he refused to answer questions on the ground that it might incriminate him. Reilly testified that he had known the plaintiff and her sister for a number of years, that he had written their applications for retirement annuities, and had had other business transactions with them; that plaintiff had signed papers in his office possibly 100 times; and that plaintiff was a teacher in the public schools, very intelligent, and well-versed in business affairs.

In 1932, while Julia M. Wert was living, her policies were delivered to Reilly for the purpose of having changes

made in them. He claims to have returned the changed policies to her. The plaintiff denied that the policies were ever returned by Reilly.

Reilly received from the defendant and presented to the plaintiff a proof-of-death blank to be used in making claim for benefits. The original is in evidence. The amount of insurance in *dollars* payable under the policies has not been filled in. Reilly testified that there was no way for the plaintiff to know how much defendant owed her except what he told her, and that at the time she executed the proof of death he told her she had approximately $2,000 coming. Plaintiff testified that she did not know until 1937 that she was entitled to more than $35 a month, and that Reilly did not tell her then, or at any other time, that she was entitled to "that sum of money."

Reilly testified that plaintiff left the policies at his office "about May 8, 1933." After the proof of loss was sent in, Reilly received from the defendant a draft for $2,126 payable to the plaintiff, with instructions not to deliver it unless the policies were obtained and returned to the defendant's Omaha office. The draft was dated April 11, 1933, and Reilly testified that he received it shortly after that date; that he saw Miss Wert "about this draft" at the time she brought the policies in; that the draft was in his possession on May 8, 1933; that "some time elapsed between the time that the policies were sent in to the Equitable and the check was turned over to me;" that he first got the check prior to March 8, 1933 (probably May), but that he did not remember the number of days. When it was called to his attention that the draft was not cashed until May 27, 1933, he testified that he received the draft "some time between April 11 and May 27, 1933;" and still later he testified that the "check was in Miss Wert's possession from the time the policies were delivered until it was indorsed;" that he did not know why he had not said that before; that he gave her the check to take away either on May 8 or some time between that and May 27; that plaintiff had the check in 'her possession part of the time

from May 9 to May 27; that he did not know when he turned the check over to plaintiff. Still later he said he presumed he gave the check to her the day it was cashed; and that he did not know why he kept the check for three weeks.

Plaintiff testified that Reilly did not give her the disputed check; that she first saw it, with the disputed signature, in 1937; that up until that time she did not know that such a check had been issued payable to her order; nor did she know that her purported indorsement was on the check.

On the back of the draft was written "Bernice L. Wert, 1810 Garfield, Lincoln, Nebraska," and underneath, "Chas. E. Reilly." Reilly testified that he saw the plaintiff write her name there, that she indorsed it "in my office," with a fountain pen, around May 8, 1933. Later he testified that he did not recall that he had said that she had indorsed it in his office. He stated that plaintiff's indorsement on the check was in green ink, and that he did not have green ink in his office because "it would not photograph successfully."

When the plaintiff was asked, "Is that your signature on the back of that check?" she answered, "No; I never saw the check." She was then asked by her counsel, "Did you ever indorse or sign that check knowingly?" Her answer was, "No, sir."

On cross-examination, defendant's counsel quoted that question and said, "I don't know just what he meant by saying 'knowingly.' Do I understand your position to be that that signature, 'Bernice L. Wert, 1810 Garfield, Lincoln, Nebraska,' on exhibit A-141, that you did not write that, is that correct?" Plaintiff answered, "I did not write that."

With reference to the disposition of the proceeds of the check, Reilly testified that in March, after Julia M. Wert's death, he and the plaintiff began to talk about Reilly's keeping the money as a personal loan; that plaintiff thought it over two or three weeks; that it was agreeable to the plaintiff; that on one of her visits to his office he had shown her the check; and that on the day that plaintiff indorsed

the check, around May 8, 1933, he had a conversation with her with reference to the proceeds of the check to the effect that, if she would let him have the money, he could pay out the balance of her premiums, the original loans would be cleared up, and her policies would be clear; that he was to pay the premiums "during the period for which the premiums had been prepaid originally;" that he was interested in the check because he was going to borrow the money; that he told the plaintiff he would pay all the premiums; that the total amount he was to pay out of her money was about $2,600; that he agreed to pay her debts without knowing how much they were; that they had no writing between them; that they made no list of what he was going to pay; that the policies upon which he was to prepay premiums were not listed; that the plaintiff did not demand a receipt; that he did not suggest giving her one; that he said nothing to her about giving her a note or written evidence of the debt; that the plaintiff said nothing about interest on the loan; that immediately after he got the money he was to invest it in real estate; that nothing was said about whether the investment in real estate was to be for the plaintiff or Reilly; that the plaintiff was to have no part in the investment in real estate; that nothing was said about an accounting to the plaintiff for this money; that the plaintiff owed $486 on one policy and $135 on another; that he did not pay off these loans; that he paid $500 on July 24, 1933, as a premium; and that he owed the plaintiff $1,626.

Plaintiff denied the entire story which Reilly told with reference to the agreed disposition of the proceeds of the check, and denied that she had received any part of the $2,126.

Reilly testified that *on the day plaintiff indorsed the draft* he personally took it to the First National Bank and indorsed it, secured the money in currency on *May 27*, 1933, put the currency in his safety box in the Commerce Trust Company, and used it for his own purposes; that he did not know how long he kept the money before he began

to spend it; that he did not know where he got the money with which to make the $500 payment; that he did not tell plaintiff that he had made the payment; that he does not know whether or not she received a receipt; that he did not know whether plaintiff ever knew he had paid it; that he was not interested in getting some acknowledgment from her that he had paid it, and that he did not conceal the payment from her.

Plaintiff testified that to her knowledge she had no loans on her policies, and that she did not know Reilly had sent $500 to the defendant company, purporting to be a premium payment from her; nor did she know that Reilly had cashed the check and taken the money.

James H. Clapp, a witness for the defendant, testified that he was the cashier in the Omaha office of the defendant; that he received the check of $2,126 from defendant and sent it "to our agent, Mr. Charles E. Reilly" at Lincoln; that he knew the home address of the plaintiff at the time he sent Reilly the check; that he later received the policies and sent them to the home office for cancelation on May 9, 1933; and that in July, 1933, he received a draft for $500 from Lincoln as a premium on two of plaintiff's policies, and that it was so applied.

The defendant introduced 53 checks and various other papers bearing the admitted signature of the plaintiff.

Herbert J. Walter of Chicago, a witness for defendant, testified as a handwriting expert. After qualifying as such, and discussing at length the admitted signatures and the disputed one, he gave it as his opinion that the signature on the disputed check was written by the same person who wrote the signatures on the checks admitted to be the genuine signatures of the plaintiff; that it was the same ink; that he had not the slightest suspicion that any one other than the plaintiff wrote the indorsement on the disputed check, and that he knew nothing about the circumstances under which the disputed signature was written.

Robert M. Walker, of Chicago, likewise qualified and testified as a handwriting expert for defendant. He gave his

reasons at length and testified that, in his opinion, the disputed signature and the admitted signatures of the plaintiff were written by the same person. When asked if green ink would photograph all right, he replied, "You have to have color screens or it won't photograph at all;" and that where different colors were involved it was necessary to take more than one picture, with different screens, to get all the signatures, and then make a composite picture.

Plaintiff offered, as a witness, a commercial photographer of Lincoln, who qualified as an expert. He testified that it was possible to photograph green ink without the use of a screen or filter; that he took a picture of the back of the check bearing the disputed signature without the use of any screen. The picture so taken was received in evidence and the disputed signature shows clearly upon it.

Defendant also called the paying teller of the First National Bank of Lincoln as an expert witness. The records of the bank show that he cashed the disputed check. He examined the plaintiff's admitted signatures, compared them with the disputed signature, and gave it as his opinion that plaintiff signed all of them.

The cashier of the National Bank of Commerce, of Lincoln, qualified as an expert witness; examined the admitted signatures and the disputed signature; and gave it as his opinion that they were written by the same person.

The jury were furnished with a magnifying glass and were permitted to examine the exhibits bearing the admitted signatures of plaintiff and the disputed signature.

We have not included in the foregoing summary any reference to the evidence, the admission of which defendant claims was an error. That evidence is favorable to the plaintiff; hence, our omitting it in the consideration of the first assignment does not prejudice the defendant. Defendant's first assignment of error is based on the proposition that this "evidence is insufficient to support a verdict in favor of plaintiff," and that "the evidence is insufficient as a matter of law to sustain a finding that the indorsement on the back of the disputed draft or check is not the indorse-

ment of the plaintiff," and that for those reasons the trial court erred in overruling defendant's motion for a directed verdict at the close of all the evidence.

To sustain its proposition defendant cites the case of *In re Estate of O'Connor*, 105 Neb. 88, 179 N. W. 401. In that case, the question before the district court for determination, without a jury, was the question as to whether or not the signature of one John O'Connor to a purported will was genuine. The county court held the signature to be a forgery; the district court held it to be genuine; and this court on appeal held it to be a forgery. In the opinion, this court stated the issue thus:

"Was the trial court clearly wrong in finding that the will offered by proponents for probate was genuine?"

The court reviewed the evidence, the testimony of the witnesses, the circumstances surrounding the finding of the alleged will, its form, the testimony of the expert witnesses, and reached the conclusion that both "the expert testimony and the circumstances in which the truth on the sole issue of fact is found confirm the charge of forgery and condemn the will as spurious."

This court in that opinion said: "When an issue of forgery in a civil case is raised by pleadings and contested by evidence on both sides, there is no presumption either in favor of witnesses or in favor of circumstances." This court further said: "From the standpoint of a genuine will the stories of the witnesses who testified that it was executed and found are unusual, if not fanciful."

Reilly's story as to the indorsement of the check, the circumstances surrounding that alleged transaction, and the agreed disposition of the proceeds, with its many contradictions, is "unusual, if not fanciful." Applying to this case the test made in the *O'Connor* case, we are unable to say that the jury were "clearly wrong" in finding that the signature of the plaintiff was not genuine, and for the same reason we are unable to reach the conclusion that the trial court was "clearly wrong" in submitting the disputed questions of fact to the determination of the jury.

The defendant also cites the case of *Bank of Commerce v. McCarty,* 119 Neb. 795, 231 N. W. 34. The issue of the forgery of a note was involved. The alleged maker of the note (defendant) positively denied the signature. She denied the circumstances under which it was alleged that she had admitted or acknowledged that the signature was hers. This court said that "the evidence as to note number 6367 being a forgery is sharply conflicting, and the same is true as to the other material points of dispute between the plaintiff and defendant," and affirmed a verdict of the jury finding for the defendant.

In the syllabus of *Bank of Commerce v. McCarty, supra,* this court held: "Testimony of handwriting experts that a promissory note offered in evidence is a forgery and does not bear the genuine signatures of the makers thereof, if based on sound reasons and circumstances supporting that theory, may be sufficient to overturn the testimony of witnesses that they saw the note executed."

This is not a holding, however, that the testimony of expert witnesses that a signature is genuine is, as a matter of law, sufficient to overturn the testimony of the alleged signer that she did not sign the disputed instrument.

"When at the close of all the evidence there is a substantial conflict in the evidence, it is proper for the court to deny a motion for a directed verdict and to submit the disputed questions of fact for the determination of the jury." *Nittler-Rhump v. Jones,* 112 Neb. 238, 199 N. W. 542.

The evidence in this case, which we have summarized, is its own best commentary. From all of the testimony, we are unable to say that the verdict of the jury is clearly wrong, and, consequently, cannot reach the conclusion that the trial court erred in refusing to direct a verdict or dismiss the case.

The question of the genuineness of the signature was submitted to the jury under an instruction in which the court stated:

"Plaintiff denies that the indorsement of the name 'Ber-

nice L. Wert,' on the back of said draft or voucher, is her signature and says that she did not sign same. Therefore the burden is upon defendant to prove by a preponderance of the evidence that it did pay the plaintiff and that she received and accepted draft in payment of her claim against defendant. * * * If you find from a preponderance of the evidence that plaintiff accepted the draft in payment of her claim and that the indorsement is in fact the genuine signature of the plaintiff, your verdict should be in favor of the defendant. On the other hand if you find that the signature is not the genuine signature of plaintiff, then your verdict would be in favor of plaintiff."

This instruction is set out for the purpose of showing the view taken by the court of the issues and the testimony, and the questions which were submitted to the jury. The defendant, in this court, does not allege error in that or any other instruction. We conclude, therefore, that defendant's first assignment of error is not sustained.

For its second assignment of error, defendant claims that the trial court erred in permitting one Edith B. Ross, a niece of the plaintiff, to testify as to conversations had with the plaintiff, Mr. Croxson, Mr. Clapp, and Mr. Reilly, at Omaha, some four years after the disputed check was cashed.

For its fourth assignment of error, defendant claims that the trial court erred in allowing plaintiff to testify as to conversations had with her niece, Mrs. Ross, Mr. Croxson, Mr. Clapp, and Mr. Reilly, at Omaha, some four years after the disputed check was cashed.

Mr. Croxson was defendant's agency manager for Nebraska and its highest officer in the state.

On this phase of the case, the testimony of the plaintiff is that she and Mrs. Ross went to defendant's office in Omaha in March, 1937, on two occasions, about a week apart, to consult with defendant concerning Reilly. The first meeting was in Clapp's office. They conferred with Clapp and Croxson, and she told Clapp $35 a month was a rather small amount to receive for what had been paid

to defendant. Clapp said, "Don't you recall that we sent you a check for $2,126?" and that she said she had never heard of it; that Croxson said, "I was watching your face when Mr. Clapp told you of this check, and I knew by the expression on your face that you had never heard of it;" and that she did not know that there was anything additional due her until that trip. According to plaintiff's testimony, this quoted statement was made during the conversation had on the first trip to Omaha.

The second conversation took place in Croxson's office, and Reilly was present. The plaintiff testified that she did not know Reilly was to be there. She repeated what she had said on the previous visit to the effect that she had never seen nor heard of the check; that Clapp did the talking and showed Reilly the check, and asked him what he knew about it; that Reilly said plaintiff had indorsed the check and he had cashed it; that Reilly did not make any claim that he had borrowed the money to pay debts or invest in real estate; that Reilly said he owed her $1,600, and had paid $500 premium from her money; that Reilly said that he might have done some things that he should not have done, but that he had not committed forgery; that Croxson and Clapp gave her to understand that they thought she had received the $2,126.

Mrs. Ross testified that during the first conversation Mr. Clapp said: "At last I think we have Charlie Reilly's back to the wall. We have been suspicious of him for a long time but he always wiggled out of it. I think we have him now where he won't be able to get away with it."

Mrs. Ross was asked, "What was said on the *second* trip by your aunt and these gentlemen about this check?" She testified: "My aunt said she had never heard of the check before and Mr. Croxson said he knew that was true because he watched her face as they told her about it and he could tell she had never seen or heard about it before."

Defendant made proper objections to the introduction of this testimony, and its objections were overruled by the trial court.

Croxson was not called as a witness. Clapp did not deny any part of this testimony.

This court in *Waits v. Columbia Fire Underwriters Agency*, 129 Neb. 207, 261 N. W. 170, cited, with approval, the following rule from 22 C. J. 367:

"An admission of an agent may be received in evidence against his principal, where the agent, in making the admission, was acting within the scope of his authority, and the transaction or negotiation to which the admission relates was pending at the time when it was made. Conversely, a declaration of an agent, not within the scope of his authority nor in the course of the negotiation to which it refers, is not admissible against the principal, unless it was made under such circumstances that the silence or acquiescence of the principal makes the admission his own, or was ratified by the principal. * * * The admission which it is sought to use must have been made in connection with the discharge of the agent's duty, must have been based on his own knowledge, *and must be a statement of fact, rather than an expression of opinion."*

The rule is stated in 22 C. J. 383, as follows:

"An admission made by the agent of an insurer is competent against the principal, provided, but not unless, it appears to have been made within the scope of the agent's authority at the time when it was made, and while he was engaged in the business of the principal, and that it amounts to a statement of fact rather than an expression of opinion."

The rule is stated in 22 C. J. 386, as follows:

"Admissions of an agent of a private corporation, when relevant to the issues, are competent against the corporation, provided, but not unless, they are within the scope of the powers of the declarant, were made in connection with the performance of his duties, and are statements of fact rather than mere expressions of opinion."

The rule is stated in 1 Jones, Evidence Civil Cases (4th ed.) 630, sec. 344:

"Declarations of conclusions or opinions, even though they may have been uttered under conditions which would

authorize their introduction if they were statements of facts, are not admissible as part of the *res gestæ*."

The rule is stated in 22 C. J. 469, as follows:

"Expressions of opinion are not ordinarily admissible as part of the *res gestæ*, even though they are accompanied by acts tending to show that the declarant really entertained the opinion so expressed."

The quoted statements, made by Mr. Clapp as to Mr. Reilly, and as to what Croxson "knew" from the expression on Miss Wert's face, are conclusions, statements of the opinion of the makers, narrative in form, are not statements of fact, and hence are not admissible.

Permitting Mrs. Ross to testify as to what Mr. Clapp said about Mr. Reilly was to tell the jury, in effect, that one of the officers of the defendant company believed the witness Reilly to be dishonest and that others in the defendant company believed the same thing. It is pointed out that this statement related to their opinion of him in 1937 and not in 1933 when he was trusted with the draft for plaintiff.

Permitting the plaintiff and the witness Mrs. Ross to testify as to what Mr. Croxson said was in effect to tell the jury that the general agent of the defendant company in Nebraska believed that plaintiff was telling the truth when she denied knowledge of the check. The admission of those two statements in evidence invaded the province of the jury, affected the substantial rights of the defendant, was prejudicial, and calls for a reversal of the case.

Defendant's third assignment is based upon the following question, which the court, over objection, permitted plaintiff to answer: "Up to that time did you have trust and confidence in him?" Plaintiff answered, "Yes." The question related to a conversation had with Reilly the early part of 1932. The defendant objected to the question as incompetent, irrelevant, and immaterial, and a self-serving declaration. The court supposed "it is foundational for something coming." Plaintiff's counsel said, "Yes, and shows the state of mind."

It is obvious that, at the time covered by the question, the plaintiff had full confidence in Reilly. It is likewise obvious that subsequent to that time, as a result of what has been disclosed in this record, she lost that confidence. We cannot believe that any substantial right of the defendant was affected by the facts disclosed in this assignment of error.

Defendant's fifth assignment of error goes to the question of attorney's fees. In view of the conclusion that we have reached in this case, it is not necessary that that assignment be considered.

Because of the errors pointed out in the admission of evidence, the judgment against the defendant is reversed, and the cause remanded for further proceedings.

REVERSED.