IN RE ESTATE OF TONY DUNBIER, DECEASED.
KENNETH L. DUNBIER, APPELLANT, v. J. T. STANTON,
EXECUTOR, APPELLEE.

103 N. W. 2d 797

Filed June 10, 1960. No. 34730.

542

*Ginsburg, Rosenberg & Ginsburg* and *Norman Krivosha,* for appellant.

*Mills, Mills & Mills,* for appellee.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

This is an action at law seeking to recover upon a claim against the estate of Tony Dunbier, deceased, herein called Tony. The claim was originally filed in the county court of Polk County by Tony's son, Kenneth L. Dunbier, called plaintiff. After a trial in the county court, a judgment was rendered which disallowed and denied plaintiff's claim, whereupon he appealed to the district court for Polk County. Therein

J. T. Stanton, executor of Tony's estate, was and will herein be called defendant. Plaintiff's claim was based in substance upon an alleged agreement with Tony that upon his death plaintiff would receive all property of Tony's estate acquired by farming operations upon certain lands belonging to the parties. Issues were made in the district court by plaintiff's petition on appeal, defendant's amended answer, and plaintiff's reply.

Upon trial to the district court with a jury waived by agreement, a judgment was rendered which found and adjudged the issues generally in favor of defendant and against plaintiff, and denied and disallowed plaintiff's petition and claim with costs taxed to plaintiff. Such judgment also found and adjudged that defendant, as executor, had in his possession certain United States government bonds, series E, having a combined maturity value of $6,500, standing in the name of Tony or plaintiff, and ordered defendant to deliver same to plaintiff upon payment by him of all succession taxes. Thereafter, plaintiff's motion for new trial was overruled and he appealed, assigning some 12 alleged errors which are in substance that the judgment of the trial court was contrary to the evidence and law. We do not sustain the assignments.

Plaintiff's petition alleged in substance that on or about 1931 Tony and plaintiff, who was then about 15 years old, entered into an oral agreement that if plaintiff would quit school, take care of the farming, and turn over to Tony the proceeds therefrom, then upon Tony's death plaintiff would receive all property and estate acquired under said farming operations, and that plaintiff had fully performed all terms of said contract on his part and turned all the proceeds over to Tony. Plaintiff also alleged that in 1936, an 80-acre farm was purchased by Tony from William Dunbier, herein called Bill, which was paid for out of proceeds of the farming operations and an inheritance from plaintiff's grandfather, at which time it was orally agreed

that such farm would be devised to plaintiff upon Tony's death; that thereafter plaintiff continued said farming operations until he was drafted into military service in July 1941; that at that time the parties had accumulated livestock of the value of $8,000 and machinery of the value of $5,000, and Tony owned 293 acres of land, all of which was held by him subject to said agreement; that during said years plaintiff owned a described 80 acres of land upon which Tony made his home, and all income therefrom belonging to plaintiff was likewise turned over to Tony under said agreement; that on or about July 19, 1941, for the purpose of settling up their affairs before plaintiff was drafted, and to provide for future arrangements between them, it was orally agreed between plaintiff and Tony that Tony would live on plaintiff's land, take over the farming operations on his land and that of plaintiff, would dispose of the livestock and machinery, and put the proceeds and all net income from the land into joint government bonds, to be held as such and then paid over to and become the sole property of the survivor; and that to evidence such agreement, they executed a written instrument on July 19, 1941, which provided as hereinafter set forth, and generally designated herein as exhibit No. 1. Plaintiff alleged that upon execution thereof, he departed for military service, and thereafter duly performed the agreement while Tony continued to make his home on plaintiff's land until his death in January 1957; that during his lifetime Tony sold livestock for $8,000, machinery for $4,700, and plaintiff's car for $500; that Tony acquired $45,500 as net rentals from land of the parties, all of which Tony placed in government bonds in the names of plaintiff and Tony, who held same under said agreement; that in December 1954, Tony delivered to plaintiff $9,000 of said bonds, and at time of Tony's death he had $6,500 of said bonds, which are in possession of defendant who has refused to deliver same to plaintiff; and that during 1955 and 1956, Tony cashed

all of said bonds except as heretofore alleged, and received therefrom $42,000, which he converted to his own use in violation of the agreement, and thereby deprived plaintiff, his survivor, of the property. Plaintiff prayed for an accounting of funds and property which should have been put in government bonds, and those purchased and acquired by Tony as well, under the agreement; and prayed for a judgment of $42,000 and that defendant deliver to plaintiff the aforesaid bonds in the sum of $6,500, or upon failure to do so, that plaintiff have judgment for $48,500 and costs.

In his amended answer, defendant specifically denied that Tony ever signed the document which plaintiff alleged had been executed on July 19, 1941; alleged that Tony's signature allegedly attached thereto was a forgery; and alleged that the instrument was drafted many years after July 19, 1941. Also, save and except as specifically admitted, defendant denied every allegation contained in plaintiff's petition. In that connection, defendant admitted that plaintiff quit school about 1931 when 15 years of age, and from that time until he was drafted in 1941, plaintiff assisted Tony in farming a described quarter section of land in Polk County. Defendant alleged that when plaintiff was drafted in 1941, he was and still is the owner of a described 80 acres of land in Polk County, and that Tony was at said time the owner of 293 acres of described land in Polk and York Counties. Defendant admitted that in 1936 Tony purchased a described 80 acres of land in Polk County from Bill, for a consideration of $7,200, but denied that plaintiff furnished any part of such consideration. Defendant admitted that in 1935 Tony purchased a Ford car and gave it to plaintiff, but defendant alleged that in 1942 Tony traded it for another car and in payment therefor purchased a $500 United States government bond, series E, which bond Tony delivered to plaintiff, who accepted it in full payment for his car. Defendant admitted that from July 1941 to December 1954, Tony

managed and collected rentals from plaintiff's described 80 acres of land for plaintiff's benefit, and that in connection therewith, Tony paid all taxes and other expenses of operating plaintiff's land. In that connection, defendant alleged that in November or December 1954, plaintiff engaged in a dispute with Tony regarding and relating to the disposition of Tony's property and the rentals herein described; that plaintiff demanded an accounting for all rentals due him as well as other obligations which plaintiff claimed Tony owed him; that thereupon Tony delivered United States government bonds, series E, having a maturity value of $9,000, to plaintiff in full settlement of all accounts allegedly owing by Tony to plaintiff, who accepted same as full and complete settlement of said accounts. Defendant admitted that he had in his possession as executor United States government bonds, series E, having a maturity value of $6,500, issued in the names of Tony or plaintiff, which bonds became plaintiff's property by reason of Tony's death, and defendant alleged that he is now and always has been ready and willing to deliver said bonds to plaintiff upon payment by him of succession taxes. Defendant prayed for a denial of plaintiff's claim except with relation to said $6,500 of bonds, and for a recovery of costs. Plaintiff's reply denied generally but admitted that he was entitled to the $6,500 of bonds aforesaid.

At the outset we dispose of plaintiff's argument that his ownership of all the bonds involved was admitted by defendant's answer when considered in the light of plaintiff's petition, therefore, plaintiff was entitled to a judgment for the proceeds from all such bonds as a matter of law. We do not agree.

As early as Fitch v. Martin, 83 Neb. 124, 119 N. W. 25, affirmed on rehearing, 84 Neb. 745, 122 N. W. 50, this court held: "If objections are interposed in the county court to the allowance of a claim against the estate of a deceased person, the issues thus framed will

be construed with great liberality in the district court.

"A plea of general settlement and payment of all claims and demands is not an implied admission that any specific cause of action existed in plaintiff's favor and against defendant during the time covered by that settlement, and is not inconsistent with a general denial."

Theretofore, in Cate & Foristall v. Hutchinson, 58 Neb. 232, 78 N. W. 500, this court held that: "A defendant may plead as many grounds of defense as he may have, provided they are not so repugnant that if one be true another must be false."

In O'Neal v. First Trust Co., 160 Neb. 469, 70 N. W. 2d 466, we held that: "An admission in an answer does not extend beyond the intendment of the admission as clearly disclosed by its context."

Also, as held in Giacomini v. Giacomini, 163 Neb. 798, 81 N. W. 2d 194: "More than one defense may be interposed to the same cause of action, provided they are not inconsistent with each other; they are not inconsistent unless the proof of one necessarily disproves the other."

Plaintiff also argued that all the government bonds here involved, which were issued in the names of Tony or plaintiff, were a gift to plaintiff, and thereafter Tony lacked any power to cash or dispose of them and deprive plaintiff of their ownership, and that such disposition by Tony was a result of his mental incompetency or fraud and undue influence. We do not agree. In that connection, plaintiff's pleadings in this case never raised any such issues. As recently as Lash v. Erisman, 167 Neb. 606, 94 N. W. 2d 32, we held that: "An issue not raised by the pleadings and proof in the district court cannot be raised for the first time in the Supreme Court.

"Except as to questions of jurisdiction, questions not presented to nor passed on by the trial court will not be considered on appeal."

In Hild v. Hild, 135 Neb. 896, 284 N. W. 730, this court

said: "One of the essential elements of a gift is the intention to make it. A clear and unmistakable intention on the part of the donor to make a gift of his property is an essential element of the gift, *and this contention must be inconsistent with any other theory.*" (Italics supplied.) In that connection, the purported issue of a gift would be entirely inconsistent with plaintiff's theory of contract. In any event, there is no competent evidence in this record that the bonds involved were a gift from Tony to plaintiff, and the evidence, although somewhat conflicting, is overwhelming that Tony was at all times mentally competent and that his disposal of some of the bonds involved during his lifetime was not the result of any fraud or undue influence.

We turn then to rules which are applicable and controlling in this case. In Lewis v. Hiskey, 166 Neb. 402, 89 N. W. 2d 132, we held that: "The findings of a court in a law action in which a jury is waived have the effect of a verdict of a jury and will not be disturbed on appeal unless clearly wrong.

"In such a case, it is not within the province of this court to resolve conflicts or to weigh evidence. If there is a conflict in the evidence this court in reviewing the judgment rendered will presume that controverted facts were decided by the trial court in favor of the successful party and the findings will not be disturbed unless clearly wrong." See, also, Grant v. Williams, 158 Neb. 107, 62 N. W. 2d 532; Plummer v. Fie, 167 Neb. 367, 93 N. W. 2d 26.

Further, in considering sufficiency of the evidence to sustain a verdict or judgment rendered by a court in a case where a jury is waived, the evidence must be considered most favorably to the successful party, any controverted fact resolved in his favor, and he must have the benefit of every inference reasonably deducible from the evidence. See, Granger v. Byrne, 160 Neb. 10, 69 N. W. 2d 293; Reynolds v. Knott, 164 Neb. 365,

82 N. W. 2d 568; Brown v. Globe Laboratories, Inc., 165 Neb. 138, 84 N. W. 2d 151.

Plaintiff argued that Helen Rafert, plaintiff's sister, as a beneficiary under the last will of Tony, was a real party in interest adversely to plaintiff and defendant, the representative of deceased, but she was not called as a witness by defendant, and, having knowledge of the facts, a presumption existed that her evidence, if produced, would mitigate against her interest.

In Medelman v. Stanton-Pilger Drainage Dist., 155 Neb. 518, 52 N. W. 2d 328, this court said: "The extent of a party's right to invoke his opponent's failure to call an available witness is to impair the value of the opponent's proof and to give greater credence to his evidence on any issue *on which it is shown that the witness might have had knowledge.* However, the probative force of any inference arising therefrom is for the triers of the facts, * * *." (Italics supplied.)

Contrary to plaintiff's contention, there is no showing in this record that Helen had any knowledge of plaintiff's alleged contract, exhibit No. 1, dated July 19, 1941. As a matter of fact, there is no showing that anyone except plaintiff and his brother Bill ever saw or heard of exhibit No. 1, and Bill admittedly had never read it until after Tony's death and plaintiff's claim was filed against Tony's estate. In answer to interrogatories propounded to plaintiff by defendant with regard to exhibit No. 1, Helen was not listed by plaintiff as a person who had any knowledge of exhibit No. 1. Also, contrary to plaintiff's contention, whether or not Tony had given Helen and her husband a start in farming when they were married was entirely irrelevant and immaterial under the issues in this case. The evidence shows that Helen and her husband moved from the home place in 1931, but there is no competent evidence in this record that Helen knew then or thereafter just what the transactions and agreements if any were between Tony and plaintiff, as contended by plaintiff. In

any event, the probative force of any inference arising from Helen's failure to testify for or against plaintiff, her brother, was a matter for the court's determination.

In Leon v. Kitchen Bros. Hotel Co., 134 Neb. 137, 277 N. W. 823, 115 A. L. R. 1078, this court held that: "Justice does not require a court or jury to accept as absolute verity any statement of a witness not contradicted by direct testimony. Circumstantial evidence is equally competent with direct testimony; their relative convincing powers as against each other are for the jury's determination."

In Medelman v. Stanton-Pilger Drainage Dist., *supra,* we held that: "Under ordinary circumstances expert opinion evidence is to be considered and weighed by the triers of fact like any other testimony."

In Wert v. Equitable Life Assurance Society, 135 Neb. 654, 283 N. W. 506, quoting from In re Estate of O'Connor, 105 Neb. 88, 179 N. W. 401, 12 A. L. R. 199, this court said: " 'When an issue of forgery in a civil case is raised by pleadings and contested by evidence on both sides, there is no presumption either in favor of witnesses or in favor of circumstances.' " Further, quoting from Bank of Commerce v. McCarty, 119 Neb. 795, 231 N. W. 34, such opinion said: " 'Testimony of handwriting experts that a promissory note offered in evidence is a forgery and does not bear the genuine signatures of the makers thereof, if based on sound reasons and circumstances supporting that theory, may be sufficient to overturn the testimony of witnesses that they saw the note executed.' "

Bank of Commerce v. McCarty, *supra,* also held: "The mere opinion of witnesses who testify alone from familiarity with a signature and from comparing genuine and disputed writing has less weight generally on the issue of forgery than expert opinions based on scientific skill and sound reasons."

In Marston v. Drobny, 166 Neb. 747, 90 N. W. 2d 408, we held that: "Triers of fact are not compelled to ac-

cept as absolute verity every statement of a witness not contradicted by direct evidence. Circumstantial evidence is equally competent with direct testimony. The relative convincing powers of the two classes of evidence are for the determination of the triers of fact.

"Evidence not directly contradicted is not necessarily binding on the triers of fact, and may be given no weight where it is inherently improbable, unreasonable, self-contradictory, or inconsistent with facts or circumstances in evidence.

"Triers of fact have the right to test the credibility of witnesses by their self-interest and to weigh undisputed parol testimony against facts and circumstances in evidence from which a conclusion may properly be drawn that the parol testimony is false."

In In re Estate of Renter, 148 Neb. 776, 29 N. W. 2d 466, we held: "Testimony of handwriting experts that the signature on an instrument offered for probate as a will is not the signature of the alleged testator, if based on sound reasons and circumstances supporting that theory, may be sufficient to overturn the testimony of subscribing witnesses that they saw the will signed.

"When an issue as to whether the signature on an instrument offered for probate as a will is that of the alleged testator is raised by pleadings and contested by evidence there is no presumption either in favor of witnesses or in favor of circumstances."

In O'Neal v. First Trust Co., *supra*, dealing with oral contracts to devise or bequeath an estate, we held: "The burden in the light of these rules has devolved upon the plaintiff to prove (1) an oral contract the terms of which are clear, satisfactory, and unequivocal, and (2) that his acts constituting performance were such as were referable solely to the contract sought to be enforced, and not such as might have been referable to some other or different contract.

"Evidence of declarations of a deceased person, concerning a parol contract, does not amount to direct proof

of the facts claimed to have been admitted by those declarations. Such evidence, when not supported by other evidence, is generally entitled to but little weight.

"Each case is to be determined from the facts, circumstances, and conditions as presented therein."

In Meisinger v. Johnson, 162 Neb. 360, 76 N. W. 2d 267, we held that: "An accord and satisfaction of a claim or demand, whether liquidated or unliquidated, may be, and, where the parties so intend or agree, is effected by the transfer and acceptance of property." See, also, Treat v. Price, 47 Neb. 875, 66 N. W. 834, cited with approval in Hileman v. Maxwell, 97 Neb. 14, 149 N. W. 44, wherein this court held: "Where a certain sum of money is tendered by a debtor to a creditor on the condition that he accept it in full satisfaction of his demand, the sum due being in dispute, the debtor must either refuse the tender or accept it as made, subject to the condition. If he accepts it, he accepts the condition also, notwithstanding any protest he may make to the contrary."

Plaintiff argued that being a co-owner of the bonds here involved by contract, Tony held them in trust, and plaintiff could not be deprived of his property rights therein by acts of Tony, therefore plaintiff was entitled to follow the proceeds of the bonds into defendant's hands and recover a judgment therefor. In that connection, as hereinafter observed, the bonds involved, except three which were issued in the name of "Tony Dunbier POD Kenneth Dunbier," and one of which was issued in the names of "Wm. H. Dunbier or Tony Dunbier," were simply issued in the names of "Tony Dunbier or Kenneth Dunbier," and plaintiff premised his case upon his alleged contractual rights, which the trial court's judgment concluded were not sufficiently established by the evidence. In comparable situations, this court and others as well, have concluded that Tony, during his lifetime, having possession of said bonds, could have cashed same without liability to plaintiff for the pro-

ceeds therefrom except and unless plaintiff's interest therein, if any, was established by gift or contract as claimed by plaintiff herein. See, Rohn v. Kelley, 156 Neb. 463, 56 N. W. 2d 711; Nelson v. Rasmussen, 164 Neb. 274, 82 N. W. 2d 418; 91 C. J. S., United States, § 126, pp. 317 and 318, together with authorities cited therein.

In the light of such rules, we have examined the voluminous evidence. Herein we summarize the evidence which has relation to this case as distinguished from Dunbier v. Rafert, *post* p. 570, 103 N. W. 2d 807, a separate equity suit against different defendants, which was consolidated herewith for trial.

During his lifetime, Tony lived on a farm called the home place, which was a quarter section of land located northwest of Gresham in Polk County. His wife died January 14, 1929, leaving as survivors Tony and three children, who are Bill, Helen, now Mrs. Ervin Rafert, and plaintiff. At time of trial Bill lived on plaintiff's 80-acre tract, a part of said home place where Bill was born and where plaintiff was temporarily staying. After the mother's death, Tony, Bill, Helen, and plaintiff lived there together until Bill's marriage in 1930, when he left to farm his own 80-acre tract nearby and a 53-acre tract owned by Tony. Helen married Ervin Rafert in 1930 and they farmed the home place for about a year, then moved to an 80-acre tract owned by Tony in York County, which land is not directly involved in this case. Prior thereto Helen had worked around the house and in the fields on the home place. Meanwhile, plaintiff attended school and started to high school until about 1931 when he quit school at about 15 years of age and began farming with Tony on the 160 acres where his family had always lived. Thus, from 1931 until plaintiff was drafted in July 1941, Tony and plaintiff batched together while Tony managed the home place and plaintiff did most of the farm work. They kept some cattle and horses and had the required farm machinery. In 1934 plaintiff bought the improved 80 acres where

they lived. In that connection, the record is not clear how such land was purchased, but the only logical inference is that plaintiff purchased it with funds derived from the farming operations of plaintiff and Tony. It is admitted that after plaintiff left for military service in July 1941, Bill, with plaintiff's knowledge and permission, took over and farmed in plaintiff's place until Tony was unable physically to carry on, and the livestock and machinery were sold in February 1944.

Tony was proud of plaintiff and pleased with his farming operations, and Bill, as well as others, testified that Tony had told them that plaintiff was supposed to be or was owner of such farm machinery and livestock. However, a former employee of the county assessor's office, who assisted Tony in making out his personal tax returns, testified that all machinery and livestock were always returned as belonging to Tony; that in plaintiff's presence, Tony had told him that he owned the machinery and livestock, which were always assessed in Tony's name; and that only a Ford car, some radio equipment, and poll taxes were ever assessed to plaintiff, except in 1942, while plaintiff was in the army, Tony made a return for him whereon Tony listed a 1936 F-20 steam tractor, and said that it was all the machinery which plaintiff owned.

Bill sold his 80-acre tract to Tony in 1936, after which time such tract was farmed by Ervin Rafert. Where the consideration for such purchase came from is not definitely shown and the evidence does not sufficiently establish that Tony agreed to devise such land to plaintiff. After the sale of his 80-acre tract, Bill moved and worked around the country until 1937 when he returned and worked as a farm hand. Bill admitted that he was placed under guardianship as a spendthrift by the county court of York County in 1939, and that he was still under such guardianship.

Tony executed a will in 1937 wherein he left Bill only $5 because during his lifetime Tony had advanced

Bill various sums of money which Tony thought constituted Bill's share of the estate. Therein he devised a described 80-acre tract of land in York County to Helen. However, such tract was subsequently deeded to Helen on August 15, 1953, by Tony during his lifetime, and such land is not here directly involved. Tony's 1937 will then devised and bequeathed all the residue of his estate to plaintiff because he had been Tony's constant companion and co-worker, had stayed at home, and in every manner had cooperated with Tony in the management of his affairs. That will nominated and appointed Tony's brother-in-law as executor. A codicil, subsequently executed by Tony, reaffirmed his 1937 will, but made plaintiff the executor. In that connection, on November 26, 1956, Tony executed a new will which revoked and cancelled all former wills and codicils; bequeathed $5,000 to Bill; and devised and bequeathed the residue of his estate in equal shares to plaintiff and Helen. That will nominated and appointed Tony's friend and attorney, the defendant herein, as executor because plaintiff was a nonresident. In that connection, Tony died January 6, 1957, when he was 80 years old, and on January 15, 1957, plaintiff, who lived in Spokane, Washington, and had never returned to resume the farming operations with Tony as contemplated by the parties and desired by Tony, was sent a copy of Tony's will by defendant, who, having prepared Tony's last will, notified plaintiff in writing that the will had been filed for probate and that the date for hearing thereon was February 8, 1957, at 2 p. m., at the county judge's office in Osceola. Plaintiff was also told that his father had indicated a time or two before the will was made what he thought he would do; that he thereafter instructed what he wanted put in the will on the date it was made; and that he wanted to change his former will because Helen had the 80 acres which he had left her in his former will and Bill would probably need something for his care as he became older.

Thereafter, on January 21, 1957, a member of a firm of lawyers in Spokane wrote to defendant in plaintiff's behalf, as follows: "Mr. Kenneth Dunbier of this city has contacted this office with reference to the above mentioned estate. Mr. Dunbier feels that he has been discriminated against in the Last Will and Testament and desires that he be furnished a copy of the Inventory and Appraisement in said estate. *He has specifically referred to the fact that the rent on his property, which he received each year, was taken care of by his father and the money used to purchase bonds in the joint names of him and his father.* It is my understanding that this was done for a period of some twenty years and, therefore, a determination should be made of how much of the bonds actually belong to Kenneth. It is our further understanding that the deceased used said bonds to purchase property, which he gave away to his daughter and grandchildren. We would appreciate your informing us of any facts regarding this." (Italics supplied.) However, plaintiff did not contest Tony's last will in any manner, and same was duly probated.

Thereafter, on February 9, 1957, appraisers were appointed by the county court and an inventory of Tony's estate was filed by the executor on March 6, 1957. Such inventory listed 213 acres of described real estate in Polk County, free of all encumbrances, and appraised at $46,000. It also listed personal property appraised at $17,156.72, which included a checking account, a Ford Fairlane 4-door sedan, certain shares of stock, an uncashed check for a dividend, an uncashed check for wheat, some grain on hand in bin, household goods, and certain government bonds standing in the names of Tony or Helen, and Tony or Kenneth. In other words, Tony's estate was appraised at $63,156.72, free of all encumbrances, which, save for certain bonds, and Bill's legacy, plaintiff and Helen took share and share alike.

Thereafter, on May 22, 1957, a member of plaintiff's Spokane firm of lawyers wrote defendant as follows:

"Enclosed is a copy of a Creditor's Claim filed by Kenneth Dunbier in the above-entitled estate. It seems inconceivable to us that Kenneth should not be entitled to something, since his father took all the proceeds from all the farms giving Kenneth nothing for a number of years. The agreement they entered into at the time Kenneth went into service specifically stated that all the balance, after all expenses, taxes, insurance, etc. were paid, was to be placed in U. S. Government Bonds in the joint names of both parties to be given to the survivor upon the death of one. Will you please discuss this matter with Mrs. Rafert and advise us of your position in the matter." In that connection, on the same date such law firm filed a claim against Tony's estate for $49,500. Thereafter, on July 3, 1957, such firm filed a bill of particulars making plaintiff's claim more definite and certain.

During July 1941, plaintiff was drafted into military service, from which he was discharged in October 1945. However, he never returned to farm with his father, who was lonesome, looked forward to plaintiff's return, and wanted him to come back and farm again. As late as early 1954 Tony bought a new farm disc so that plaintiff would have it to use when he returned to farming. As a matter of fact, plaintiff came home only four times between July 1941 and December 1954, after which time he never returned to see Tony again during his lifetime or after his death, claiming that he was ill and could not return for Tony's funeral. Plaintiff did see Tony in 1948 and again in 1952 when Tony went out to Spokane, Washington, for a visit.

When plaintiff and Tony started farming together, Tony owned two 80-acre tracts and one 53-acre tract of land, and by July 1941, plaintiff had acquired the involved 80-acre tract and Tony had acquired the 80-acre tract from Bill, so that plaintiff then owned only 80 acres and Tony owned 293 acres. Bill, at the time of trial, had the benefit of $5,000 bequeathed

to him by Tony in his last will and, according to plaintiff's testimony, Bill had been taken care of also by a will executed by plaintiff. Bill testified at the trial that he witnessed the signing of exhibit No. 1, allegedly executed by plaintiff and Tony on July 19, 1941, but Bill could not remember the date of its execution, and he never read the contract at that time and never saw it again until it was shown to him when his deposition was taken in the present litigation. However, Bill claims that he heard plaintiff and Tony arguing about the fact that while plaintiff was in the service they wanted some contract on their business so that if plaintiff went to the service and died, all plaintiff's money would be put in joint bonds and go to Tony, and if Tony died it would all go to plaintiff, so plaintiff prepared a contract but Tony wouldn't sign because it didn't give him the right to live on plaintiff's land, so plaintiff drew the contract to so provide and Tony signed it with the same pen he did, which was one Bill had sent to plaintiff from Reno, Nevada. Such alleged contract read as follows: "July 19, 1941  Do to me Kenneth L. Dunbier being in the draft and going into the Army, am entering into a partnership contract with my father Tony Dunbier. That all rents money of land owned by Kenneth L. Dunbier and Tony Dunbier be put into joint government bonds and left till either partners death. I Kenneth L. Dunbier also agree to let my father Tony Dunbier live on my farm as long as he desires and operate on these basis. Signed by:  Tony Dunbier Kenneth L. Dunbier and on this day of July 19, 1941 Witnessed by: William H. Dunbier Kenneth L. Dunbier."

It will be noted that the witnesses thereto were plaintiff and Bill, both of whom testified that the signature thereon was Tony's. A lawyer, who was also a banker, gave his opinion that the signature appearing on exhibit No. 1 was that of Tony. However, such witness had admittedly been theretofore employed by plaintiff in this case upon a contingent fee basis but had withdrawn in

order to testify, and he explained that he expected to be paid by plaintiff for only services already rendered. He testified that before plaintiff entered the army in 1941, plaintiff and Tony came to his office where Tony said that they had some business interests which they would like to get into the form of an agreement or some arrangement whereby it would be taken care of in case something happened to plaintiff or Tony; that plaintiff had some machinery and livestock; that they had been farming the quarter section in Polk County, and had accumulated some money; that their plan was to put the money in joint bonds so that the survivor would have it; and that the property they had in mind was the quarter section they were farming and the 133 acres in Polk County, but the land farmed by Raferts in York County was not to be involved. The lawyer testified that such arrangement was satisfactory to plaintiff, but Tony had a coughing spell and left the office, so plaintiff was advised to write up something, have Tony sign it, and have it witnessed.

In that connection, however, plaintiff's answer to interrogatories propounded by defendant did not list such lawyer as a person who had any knowledge of facts relating to the alleged contract of July 19, 1941, relied upon by plaintiff, and in May 1957, after plaintiff had filed his claim, such lawyer admittedly told counsel for defendant that he knew nothing about any contract between plaintiff and Tony. It is significant also we believe that there is no testimony that any person except plaintiff had ever seen or heard of exhibit No. 1 from the time of its alleged execution July 19, 1941, until after Tony's death and plaintiff's claim was filed. Further, a sale was had by Tony of all livestock, machinery, and farm equipment on February 18, 1944, with plaintiff's knowledge and permission, as plaintiff instructed, because he might not return to the farm and the sale could be had provided that Tony would put the proceeds in joint bonds as he did plaintiff's car money. In that con-

nection, the lawyer and banker aforesaid admittedly clerked such sale of machinery and livestock which was advertised as " 'Owner, Tony Dunbier' " and such lawyer and banker reported the sale as "Auction sale, Tony Dunbier Owner February 18, 1944." Admittedly, the total received from the sale was only $4,908.70, with a net of $4,712.70 remaining, which sum was deposited on March 16, 1944, in Tony's account by the lawyer banker. A report of the sale as aforesaid was also prepared by plaintiff's cousin and sent to plaintiff, who then wrote to his cousin that he had received such report; that he was glad to hear that everything went so well; to tell Tony that he almost sent him $91.30 to make it an even $5,000; that he thought it was a good deal since he didn't know if he would ever use the stuff; and that he knew how much work it was for Tony to continue on with the farm. In that connection also, only three United States government bonds, having a maturity value of $2,000 and costing $1,500, were bought in the names of "Tony Dunbier or Kenneth Dunbier" or "Tony Dunbier POD Kenneth Dunbier" after March 16, 1944, and during the year 1944, and we find nothing in the record indicating any complaint by plaintiff of Tony's failure to put the sale proceeds into government bonds, although plaintiff's cousin kept him advised of bonds purchased by Tony.

Plaintiff's cousin testified that Tony asked her to write plaintiff and find out what to do with plaintiff's car and plaintiff replied, " 'Better get rid of the car,' " and on April 1, 1942, plaintiff wrote inquiring what his cousin had done with the money from his V-8 coupé and telling her to put it into savings bonds. In that connection, Tony, who had originally given plaintiff the car, traded it in during 1941 or 1942 on another car Tony was buying, and he then bought a $500 United States government bond, issued in the names of "Tony Dunbier or Kenneth Dunbier," and thereafter plaintiff received all $500 bonds so issued in their names during

1942, 1943, and 1944. Plaintiff's cousin wrote letters to plaintiff for Tony while plaintiff was in service, and in turn plaintiff would correspond with his cousin rather than Tony, who would come to her home to learn of any news from plaintiff. She testified that on several occasions Tony told her that his agreement with plaintiff was that he was to look after the place and business; pay all taxes, insurance, and expenses; have a good living; and put what was left in joint bonds. She testified that Tony would buy bonds and bring them over to have her make a list of the serial numbers, and to the best of her recollection all of them were in joint ownership with Tony and Kenneth. As a matter of fact, however, one of such bonds purchased by Tony was issued to "Wm. H. Dunbier or Tony Dunbier." Some were issued to "Tony Dunbier or Kenneth Dunbier." Three were issued to "Tony Dunbier POD Kenneth Dunbier," and some were issued to "Tony Dunbier" only. In December 1951, plaintiff and Tony came to defendant's office to visit and before they left Tony asked defendant, in plaintiff's presence, if it would make any difference in his estate if he transferred some of his bonds to plaintiff so he would have joint title, which to us indicates a then testamentary intent rather than any contractual obligation. They were advised by defendant that it would not affect Tony's estate except that on his death such bonds would go to the co-owner, subject to succession taxes. Thus, on December 28, 1951, 11 bonds originally issued in the name of "Tony Dunbier" were admittedly so reissued in the names of "Tony Dunbier or Kenneth Dunbier." Plaintiff's cousin testified that Tony did not tell her to notify plaintiff when he bought bonds, but when the full list, except the last two entries, was made by her, Tony mentioned that he wanted to send a list to plaintiff, so she copied it and did so.

Of the $46,500 maturity value of government bonds owned by Tony in December 1954, plaintiff was then delivered $9,000 thereof issued in the names of Tony

or plaintiff, and $6,500 maturity value thereof issued to Tony or plaintiff are presently held by the executor. The remaining bonds, having a $31,000 maturity value, all of which were issued to Tony or plaintiff, or Tony POD plaintiff, with one $500 maturity value bond issued to Bill or Tony, were cashed or disposed of by Tony during 1955 and 1956.

After the farm sale held in 1944, the home quarter section, that is plaintiff's 80 acres and Tony's 80 acres, was rented to three parties named Tuepker who farmed it until 1952. There was some trouble about consolidation of schools and Tony refused to tell Tuepkers whether he would rent to them the next year, so they called plaintiff over the telephone, who told them that he left all those decisions to Tony. Thus, in July 1952, Tuepkers received notice to quit, signed by Tony and plaintiff, by Tony his agent.

Helen's three sons, Robert, Don, and Harley, then put in the wheat on the home place in the fall of 1952 and farmed the land on a share basis from that time on except that Robert, who married, moved away and rented other land. The other two boys hauled plaintiff's water and winter fuel, carried water for him, put plumbing in plaintiff's house where Tony lived, overhauled his porch, put down linoleum, put in oil heat, mowed Tony's lawn, drove him to town and elsewhere, went to see him every day to make sure he was all right, shaved him practically all the time, went on trips with him, and they ate their meals together quite often. Tony was afflicted with asthma and growing older, so when he was ill he stayed at the Rafert home. He thought a lot of the boys, his grandsons, saying often that they were fine, thrifty boys, good hustlers, who had always been real good to him, and that he wanted to do something for them during his lifetime.

In the spring of 1955, the three boys contracted to buy the Hines farm in York County for $40,000, but Robert was later released from the contract and the

other two boys began negotiations with the Federal Land Bank for a loan of $20,000. However, when Tony learned about it, he offered to loan such money to the boys. A down payment of $6,000 had been made by the boys at the time the contract was signed. Thus in July 1955, the two boys, their parents, their young sister, and Tony went to the office of John D. Zeilinger in York to settle for the land. John D. Zeilinger was then county attorney, practicing law in York, and represented the administrator of the Hines estate and the heirs thereof, who signed the contract and authorized him to complete the transaction. He is now district judge. In his then office, the boys paid $14,000 of the balance out of their lifetime earnings, and Tony paid the remaining $20,000, taking back a 10-year note bearing four percent interest, and that amount was secured by a mortgage on the Hines farm executed by the boys. That land is not directly involved in this action. There Tony told Zeilinger that he had cashed some bonds and he wanted to help the boys.

Later, Tony's grandsons put down an irrigation well on the Hines farm and purchased necessary irrigation pipe and equipment which were paid for by Tony. Some land leveling was also done on the Hines farm, and because the boys did not have enough money to pay for all of it, Tony paid one-half of the cost. Tony also bought three corn cribs for the boys because he wanted their corn covered. No interest was ever paid by the boys on Tony's $20,000 loan, and on December 10, 1956, he came to see the boys and said he wanted them to drive him to Stromsburg. There they went to the law office of defendant herein who had prepared Tony's will on November 26, 1956, and Tony asked him to prepare a release of the mortgage because he wanted to do something for the boys in his lifetime. He had made comparable statements to several other persons. There the release of the mortgage was executed and acknowledged

before defendant, and same was subsequently filed of record.

We turn then to the evidence relating to the validity of plaintiff's exhibit No. 1, which plaintiff alleged was executed July 19, 1941, and defendant claimed that same could not have been executed, if ever, before February 1955, after plaintiff had allegedly made a complete settlement with Tony in December 1954.

In that connection, a law professor at Creighton University, who was a witness for defendant, qualified as an expert examiner of documents. As such, he examined the instrument dated July 19, 1941, upon which plaintiff primarily relies, and testified that from a comparison of signatures he could not give a conclusion upon whether or not Tony's signature thereon was a true signature. However, he noticed that a glowing fluorescence appeared when ink on the instrument was subjected to ultraviolet light, which indicated that it had the symptoms of R.C. 35, which was an additive put in ink and marketed by Sheaffer Pen Company in February 1955. At the request of defendant's counsel, and with permission of plaintiff's counsel, he then forwarded the instrument to the chief chemist for Sheaffer Pen Company for further examination. Such chief chemist, a witness for defendant, qualified at length as an ink chemist of renown. He had been graduated from Trinity College with a major in chemistry, had received his Masters degree the following year, and had attended graduate school at Columbia University for further study in chemistry. He had written numerous important articles for publication, including the chapter "Writing Ink" appearing in the Encyclopedia Britannica, and he had received distinguished service awards in the field of such chemistry. He testified that as early as 1940 he conceived the idea of finding a substance to put in ink which would fluoresce and leave a visible mark on paper fiber after the writing had been solubly eradicated, and that he then proceeded to investigate and ex-

periment with synthetic dyes and fluorescent substances known to be soluble, but found no substance that had the necessary properties. In the mid and late 1940s other chemicals came upon the market, so he experimented with those substances and investigated and examined all inks on the market, but never found any ink that had the properties he had theretofore conceived. Finally, he was able to find an efficient combination of substances which, put in ink, would fluoresce and leave a visible mark on paper fiber after the writing had been solubly eradicated. Thus, in February 1955, such substance, called R.C. 35, was first put in ink and placed on the market. He testified that as a result of his examination of the ink on plaintiff's exhibit No. 1, it was inevitable that it contained R.C. 35, which was not available in 1941, and that the document could not have been written until after 1955. He testified that each of the purported signatures fluoresced as it did when ink contained R.C. 35, and that the alleged signatures of Tony and plaintiff were written with a different pen, which is supported by a casual examination of a photostat of the document appearing in evidence. In that connection, also, such chemist performed an experiment and analysis of the ink on exhibit No. 1 in open court, which demonstrated that the writing fluoresced under ultraviolet light, and upon soluble eradication, left visible marks on the paper fiber exactly like R.C. 35 would do. Such chemist also made like experiments in open court upon two exhibits offered in evidence by plaintiff. One such exhibit was purportedly signed by Tony on April 7, 1932, and the other exhibit was a letter written by plaintiff to his cousin on March 6, 1944. Such experiments demonstrated that the ink and writing on neither exhibit fluoresced in any manner.

One witness was called by plaintiff who qualified as a chemist and expert in connection with disputed documents. He testified that he had studied inks and compounds and their manufacture and traits which varied

in their composition. He had examined exhibit No. 1 and observed a fluorescence of the ink in general and a different type in areas of eradication. However, he testified that in order to determine what compounds were contained in the ink and whether it fluoresced after eradication, it would be necessary to remove all ink from the document and then there would probably not be enough, and he could not give an opinion whether it was written with ink containing R.C. 35. In that connection, it is significant that although he testified that he had served as an expert witness in enumerated disputed document cases, he did not testify herein to the validity of Tony's purported signature on the document involved. As we view it, the evidence, facts, and circumstances with regard to the validity of exhibit No. 1 and the date of its alleged execution, if ever, was conflicting and a question for determination by the court. In that connection, plaintiff, assuming that the signatures thereon were genuine, argued that exhibit No. 1 could not have been executed by the parties in 1955 or thereafter because Tony and plaintiff were never together after December 1954. However, if exhibit No. 1 were a forgery as to time or execution, there certainly was no necessity that they should be together in 1955.

In any event, defendant contended that in December 1954, plaintiff had a complete settlement of rentals and all other obligations which plaintiff then claimed were due him from Tony, by delivering to plaintiff United States bonds having a maturity value of $9,000, which plaintiff accepted in full settlement. In that connection, exhibit No. 1 contains no provision that Tony was to look after the place and business, pay all taxes, insurance, and expenses, and have a good living, and what was left would then be put in government bonds, as contended by plaintiff. Also, under the facts and circumstances presented herein, plaintiff's alleged agreement could have been intended to be operative only

while plaintiff was in the army, and same could as well have applied only to the rents from plaintiff's 80-acre tract as suggested by plaintiff's Spokane attorneys on January 21, 1957.

Be that as it may, plaintiff testified that in December 1954, when he visited Tony, he told plaintiff that he had deeded Helen the 80 acres in York County, and that the $9,000 in bonds were given to plaintiff in order to pacify him because thereof, and that there was no settlement made at that time. Plaintiff admitted that he received $9,000 in bonds at that time, but testified that Tony just reached in his safe deposit box and, without counting or checking the bonds, handed them in a bunch to plaintiff and told him to do as he liked with them. In that connection, it will be remembered that the 80 acres deeded to Helen was the same land which had been devised to her by Tony's 1937 will which plaintiff testified he had seen, although that was denied by other evidence, and such land was admittedly not included in plaintiff's claimed agreement with Tony.

On the other hand, after receiving the $9,000 in bonds, plaintiff was taken by Tony, Helen, her husband Ervin, and their son Don to the depot at Columbus so that plaintiff could catch a train and return to Spokane. While waiting there, Ervin told plaintiff, " 'Now, Kenneth, I don't care, it's none of my business how much you have got in your settlement, but I would like to know how you arrived at a figure,' " to which plaintiff replied "that they had taken the number of acres into the number of bonds and divided it and arrived at a figure * * * 'I have made a complete settlement with my father' * * * 'I have got all my rent so far. I have got all my rent.' " Don also heard his father Ervin jokingly tell plaintiff that " 'Usually prospectors come out of the hills with money. I hear you are taking money back into the hills,' " meaning to Spokane, Washington. He also heard his father say, " 'Kenneth, I'm not interested in finding out how you got paid your rent; as far as

the amount, I'm not a bit interested in knowing how much you got; but I'm curious to know how you arrived at a figure on your rent,' " to which plaintiff replied, " 'Yes; I will tell you.' " However, not being interested, Don then walked away and did not hear the rest of his father's conversation with plaintiff. Plaintiff denied that he had any such conversation. In that connection, however, a near neighbor who had known and visited with Tony many different times, testified that a day or two after plaintiff had left for Spokane, he was at Tony's place and visited with Tony, whereat "He said at that time he had settled with * * * Kenneth."

We believe there is ample evidence in this record to support a finding that in December 1954, when plaintiff received the $9,000 of bonds from Tony, which included the $500 bond for plaintiff's car, he accepted them in full settlement of the rents and other obligations which were then in dispute. In that connection, plaintiff claims in any event that the trial court should have permitted plaintiff to recover a balance of rents due him from his land during 1955 and 1956. However, the evidence with relation thereto and with regard to taxes, insurance, and expenses paid at all times by Tony, was so incomprehensible as to be wholly insufficient to support any finding or determination by the trial court that plaintiff was entitled to recover any balance of rents on his land for 1955 and 1956.

For reasons heretofore stated, we conclude that the judgment of the trial court should be and hereby is affirmed.

AFFIRMED.