Kenneth L. Dunbier, appellant, v. Harley D. Rafert
et al., appellees.

103 N. W. 2d 814

Filed June 10, 1960.   No. 34731.

*Ginsburg, Rosenberg & Ginsburg* and *Norman Krivosha,* for appellant.

*Mills, Mills & Mills, for appellees.*

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an action in equity brought in the district court for Polk County by Kenneth L. Dunbier, as plaintiff, against Harley D. Rafert and Don L. Rafert, defendants. The purpose of the action was to require an accounting from the defendants to the plaintiff for the proceeds of certain United States savings bonds, series E, which the plaintiff contends he owns, and to impress a lien on real estate belonging to the defendants acquired with the proceeds of such bonds alleged to have been

wrongfully converted and received by the defendants without consideration. The trial court found generally in favor of the defendants and against the plaintiff, and that Tony Dunbier was not incompetent as alleged by the plaintiff and not controlled by undue influence as alleged by the plaintiff. The court further found that the alleged partnership between the plaintiff and Tony Dunbier was not established by the evidence, and denied the plaintiff's petition. Judgment was rendered in accordance with the above findings. The plaintiff filed a motion for new trial which was overruled. From the order overruling the plaintiff's motion for new trial, the plaintiff appealed.

The plaintiff's petition alleged that on or prior to July 15, 1955, he was the owner, in partnership with Tony Dunbier, of certain United States savings bonds, series E, of an aggregate cash value in excess of $37,500; that the plaintiff's ownership of said bonds was known to the defendants; that it was part of a partnership agreement between the plaintiff and Tony Dunbier that said bonds would belong in full to the survivor of Tony Dunbier and the plaintiff, which fact was well known to the defendants; that on or about July 14, 1955, Tony Dunbier cashed bonds in the principal sum of $20,000, and loaned said amount to the defendants to be used by them for the purchase of certain real estate; that the defendants knew of plaintiff's ownership of said bonds; that to evidence said loan defendants executed and delivered to Tony Dunbier their mortgage deed thereby agreeing to repay the loan within a period of 10 years with interest at the rate of 4 percent per annum; that the mortgage was duly recorded; that although the mortgage and the indebtedness evidenced thereby were by defendants executed, payable in the name of Tony Dunbier, defendants knew at all times of the plaintiff's ownership and his right to the money so borrowed by them; that on or about December 10, 1956, at which time there was still due from the defendants upon said mortgage

indebtedness the sum of $20,000 and interest in the amount of $1,124.44, the defendants prevailed upon Tony Dunbier, for no consideration, to execute and deliver to them a release of said mortgage, with full knowledge on defendants' part that the mortgage loan was made to them with funds belonging to the plaintiff; that Tony Dunbier had no right or authority to release the mortgage without full payment thereof; that at the time of the procurement of the release by the defendants, Tony Dunbier, the grandfather of the defendants, was under complete domination and control of the defendants and their mother, Helen Rafert; that said release was procured by the defendants through and by the exercise of duress and undue influence on the part of the defendants and their mother; that in further continuance of said conspiracy the defendants, during 1956, procured Tony Dunbier to cash additional bonds belonging to the plaintiff in the amount of $10,000, and to advance the $10,000 to the defendants for the purpose of improving the real estate as aforesaid; that the defendants failed to make any repayment for the advancements which went into and enhanced the value of the real estate belonging to the defendants; that Tony Dunbier died in January 1957, and thereupon the plaintiff became the sole and absolute owner of said bonds and all of the proceeds therefrom; that the plaintiff was entitled to have the release of the mortgage set aside; that the plaintiff was entitled to have a lien impressed on said real estate for the advancement of the $10,000 representing the proceeds of the bonds; and that the plaintiff was entitled to an accounting from the defendants for the proceeds of all of the said bonds. The prayer of the petition was in accordance with the above.

The defendants' amended answer admitted that on or about July 14, 1955, Tony Dunbier, the grandfather of these defendants, loaned them $20,000 in consideration for which these defendants delivered to Tony Dunbier their promissory note in the amount of $20,000,

payable in 10 years and bearing interest at the rate of 4 percent per annum; that such amount was received and used by defendants to purchase certain real estate; that said note was secured by a mortgage on the real estate so purchased; that no payment had been made on said obligation, but that on or about December 10, 1956, Tony Dunbier released said mortgage and canceled the indebtedness which the same secured, as a gift to these defendants; that Helen Rafert was the daughter of Tony Dunbier and the mother of these defendants; that Tony Dunbier died during January 1957; and that Tony Dunbier paid for certain improvements to the real estate owned by these defendants. The defendants alleged that said improvements were made with funds belonging to Tony Dunbier and were made as a gift to these defendants. The defendants further alleged that prior to July 1955, Tony Dunbier operated or managed certain real estate belonging to the plaintiff, collecting the income therefrom and paying taxes and certain other expenses incurred in connection therewith; alleged that these defendants lacked information sufficient to form a belief as to the arrangements the plaintiff and Tony Dunbier had in regard thereto; and denied the plaintiff's allegation of a partnership agreement relating thereto. The defendants further alleged that if a contract was made upon the terms as alleged by plaintiff, the consideration running from the plaintiff to Tony Dunbier was so grossly inadequate that a court of equity would not permit the plaintiff to receive the benefits therefrom; that Tony Dunbier and the plaintiff had a dispute about the indebtedness of Tony Dunbier to the plaintiff, including certain income from the real estate belonging to the plaintiff; that thereupon Tony Dunbier delivered to the plaintiff certain United States government bonds of the maturity value of $9,000 in full settlement of all the indebtedness owed by said Tony Dunbier to the plaintiff, including the income from the plaintiff's real estate held by Tony Dunbier; and that

said bonds were received by the plaintiff in full satisfaction of said indebtedness. These defendants specifically denied that the plaintiff had any interest in the funds loaned to them or used by Tony Dunbier for and in behalf of these defendants. The defendants specifically denied that the funds were procured by undue influence, but alleged they were a gift the defendants received from Tony Dunbier. The defendants further alleged that the document on which plaintiff relied as a partnership contract between him and Tony Dunbier was a forgery. The prayer was for denial of the plaintiff's petition.

The plaintiff's reply denied all allegations of the defendants' answer not admitted, and for further reply alleged that on or about December 10, 1956, and some time prior thereto, and at the time of the execution of the release of the mortgage on behalf of the defendants, Tony Dunbier was not of sound mind and was mentally incompetent; and that such release and cancellation were procured by the defendants and their mother, Helen Rafert, by the exercise of undue influence upon Tony Dunbier.

The record shows that during his lifetime Tony Dunbier lived on a farm in Polk County. His wife, Gertrude, died on January 14, 1929. She left surviving her a husband, Tony, and three children, William H. Dunbier, Helen Dunbier, and Kenneth L. Dunbier. Tony Dunbier died on January 6, 1957. At that time he was 80 years of age.

We will refer to Tony Dunbier as Tony; to William H. Dunbier as Bill; to Kenneth L. Dunbier as Kenneth, or plaintiff; and to Helen Dunbier Rafert as Helen.

Helen married Ervin Rafert in 1930. She had three sons, two of whom are the defendants Harley D. Rafert and Don L. Rafert, the grandsons of Tony. Bill was the oldest Dunbier child and Kenneth the youngest. Kenneth completed the eighth grade in school. Tony owned 80 acres of land in Polk County which adjoined 80 acres

owned by Kenneth. Kenneth acquired title to his 80 acres of land on May 3, 1934. Tony also owned a separate 53 acres of land in Polk County and 80 acres of land in York County. In 1936, Tony bought 80 acres of land which Bill owned. Kenneth was between 11 and 12 years old when his mother died. Helen and Ervin lived on the home place for a year or two after their marriage, then moved to a farm in York County owned by Tony. There is testimony to the effect that Helen could not get along with Tony. Bill was married in 1930, and left the home place.

From 1931 until July 1941, Tony and Kenneth batched together on the 160 acres of land above mentioned. The other land owned by Tony was farmed by the Raferts during the period from 1931 to July 1941, when Kenneth was called into military service. Kenneth did most of the farm work. Tony and Kenneth kept livestock on the farm, farmed with horses, and had a full line of machinery. Tony was pleased with Kenneth's farming, bragged about Kenneth, and was proud of him.

Bill testified that Tony told him that Tony had started Bill out in farming, and also Helen, and that he was starting Kenneth out. He also told Bill that the machinery and livestock belonged to Kenneth.

Tony, on numerous occasions, told Iris Dey that the "whole thing" was Kenneth's.

A former employee of the Polk County assessor's office, who assisted Tony with his personal tax return, testified that the machinery and cattle were assessed in Tony's name; that Kenneth possessed a Ford automobile, a radio, and was assessed for poll tax; that Kenneth was present when Tony told this witness that he owned the machinery and livestock; that in 1942, when Kenneth was in the army, Tony signed a tax return "Kenneth Dunbier by Tony Dunbier"; and that on the 1942 tax return there appeared a 1936 F-20 steam tractor belonging to Kenneth, which was all the machinery Kenneth owned, according to Tony. The machinery

and livestock were always turned in in Tony's name. Tony paid the taxes on his land and on Kenneth's land. Tony also paid the insurance premiums on the improvements on both his land and Kenneth's land.

Bill was placed under guardianship in April 1939, by proceedings in the county court of York County, on the ground that he was a spendthrift.

On June 19, 1937, Tony made a will in which he gave Bill $5, Helen an 80-acre tract of land in York County, and the remainder of his estate to Kenneth, "* * * for the reason that my son has been my constant companion and coworker and has stayed at home with me, and in every manner has cooperated with me in the management of my affairs, and it is my wish that he have all of the balance of my estate other than specifically devised and bequeathed heretofore." This will was reaffirmed by a codicil drawn in 1953.

On November 26, 1956, Tony made a new will revoking and canceling any and all former wills and codicils to wills made by him. He had come to the conclusion that he desired to do something for Bill, so in his last will and testament he made a bequest to Bill in the amount of $5,000, and left all the remaining balance of his property to be divided equally between Helen and Kenneth.

Bill testified that he heard Tony and Kenneth talk about a contract to the effect that in the event Kenneth was killed Tony would receive the money, or in the alternative, if Tony should die, Kenneth would receive the money resulting from the farming endeavors. For this purpose, Tony and Kenneth were going to the Gresham bank and have a lawyer prepare a contract. They contacted the lawyer. This lawyer testified that Tony told him that Kenneth was going into the service and that Tony and Kenneth had business interests and wanted an agreement drawn; that the arrangements were that Tony had started Kenneth in farming; that there was some machinery and livestock, and some

money had been accumulated; and that the plan was to take the money and put it in government bonds so the survivor would have the bonds. Tony also told this witness that the income from the property was from the 160 acres that he and Kenneth owned and were farming, and 133 acres in Polk County. Kenneth said such an arrangement was satisfactory to him. At that time Tony developed a violent coughing spell and had to leave, and he did not return for the purpose of making the contract. This witness told Kenneth to write up an agreement, have Tony sign it, and have it witnessed. On cross-examination this witness testified that he remembered visiting with defendants' counsel with reference to this matter in May 1957; and that defendants' counsel asked him if he knew anything about a contract or agreement between Tony and Kenneth and he said that he did not know of any such contract.

The alleged contract is as follows: "Do to me Kenneth L. Dunbier being in the draft and going into the Army, am entering into a partnership contract with my father Tony Dunbier. That all rents money of land owned by Kenneth L. Dunbier and Tony Dunbier be put into joint government bonds and left till either partners death. I Kenneth L. Dunbier also agree to let my father Tony Dunbier live on my farm as long as he desires and operate on these basis. Signed by: Tony Dunbier Kenneth L. Dunbier and on this day of July 19, 1941 Witnessed by: William H. Dunbier Kenneth L. Dunbier."

Bill and Kenneth testified that the signatures on the agreement were genuine, as did the banker in the Gresham bank where Tony had a checking account. Other signatures of Tony were introduced for comparison purposes.

Bill testified that Tony and Kenneth argued because the first contract that was made between them did not permit Tony to reside on Kenneth's 80 acres where the

improvements were located, and Tony refused to sign such an agreement.

Gladys Linton, a cousin of Kenneth, testified that Tony would buy bonds in the joint names of Kenneth and Tony, and bring them to her. She would put down the serial numbers every time Tony brought bonds to her, and make a record of the bonds. She further testified that to the best of her recollection all of such bonds were in the joint names of Kenneth and Tony. After she compiled a list and put the numbers down, she would give the bonds back to Tony. Tony desired that a list of the bonds be sent to Kenneth, and she sent Kenneth such a list. Kenneth testified that Gladys Linton wrote him and gave him the serial numbers of the bonds that Tony purchased, commencing with the time Kenneth was overseas. From this information Kenneth compiled a list of the bonds. After Kenneth left for military service, Tony told Gladys Linton that he was to look after the place and the business, pay all of the taxes and insurance, have a good living, and what was left would be put into joint government bonds.

After Kenneth left for military service, Bill farmed the land for about 2 years, then a farm sale was had of all the machinery and livestock on the place.

Gladys Linton testified that prior to the sale, farming was getting to be too much for Tony and he asked her to write and ask what Kenneth thought about having a sale. She wrote to Kenneth and received a reply in which Kenneth consented to a sale because things were selling high; he said that it would probably be the best thing to do as he did not know if he would get back from the war, and if he did get back he did not know whether he would farm; and that his father had his word to sell, providing the money from the sale was put into government bonds.

With reference to Kenneth's car, he wrote and told Tony to get rid of it. Tony traded Kenneth's car on a car he was buying in 1941 or 1942, and purchased a

$500 government bond issued in the names of Tony or Kenneth.

A farm sale was held in February 1944. This sale was advertised in Tony's name as owner of the items to be sold. A report of the sale listed the purchasers and the property sold. The sale netted $4,712.70, which was deposited to Tony's account on March 16, 1944, in the Gresham State Bank. Gladys Linton prepared a report of the sale from information she obtained from Tony, and forwarded the same to Kenneth. Kenneth replied that he had received the results of the sale, was pleased with the same, and said that he did not know if he would ever use the stuff, and knew how much work it was for his father to continue on.

The record shows that certain United States government bonds, series E, were acquired by Tony in the maturity value of $46,500. One bond was issued to William H. Dunbier or Tony Dunbier. Eleven of such bonds, originally issued in Tony's name, of a maturity value of $9,000, upon Tony's application were reissued in the names of Tony Dunbier or Kenneth Dunbier, in 1951. It appears that in December 1954, all of the government bonds, with the exception of one issued in the name of William H. Dunbier or Tony Dunbier, were either issued as Tony Dunbier or Kenneth Dunbier, or Tony Dunbier, POD Kenneth Dunbier. Taking such bonds at their maturity value which was $46,500, $6,500 remained in Tony's safe deposit box, $9,000 had been given to Kenneth, and the balance of $31,000 were cashed by Tony as follows: $18,000 on July 14, 1955; $3,500 on April 10, 1956; $6,500 on May 9, 1956; $2,000 on September 18, 1956; and $1,000 on November 28, 1956. We will consider the bonds as above set forth in connection with other evidence in the case.

While Kenneth was in military service, he was home on sick leave in 1943 or 1944. He also saw Tony in 1945. He was sent to Spokane, Washington, and in 1948 Tony visited him there. Tony also visited him in

Spokane in 1953. Kenneth visited Tony in Nebraska in December 1951 and in December 1954.

Gladys Linton testified that after the last time Kenneth visited home she talked to Tony about Kenneth, and his feelings toward Kenneth had not changed. Kenneth thought that his father would like to have him return to the farm. Iris Dey testified that Tony was very lonesome when Kenneth was gone to the army, and looked forward to his coming back. Kenneth never returned home to farm. He made his residence in Spokane, Washington.

In August 1953, Tony discussed the matter of transferring certain real estate to Helen with his attorney. This was the 80 acres of land in York County which he had previously devised to Helen in his will made in June 1937. The purpose of transferring the land was to enable Helen's daughter to attend a school in York County. Papers were prepared, consisting of a deed from Tony to Helen dated August 15, 1953, and a real estate mortgage from Helen to Tony. The consideration shown in the deed was $11,680. There was also prepared a release of the mortgage, and a quitclaim deed from Helen and her husband to Tony. The attorney understood that this was a temporary matter. Later Tony informed the attorney that Helen and Ervin Rafert were buying the 80 acres of land and there would be no further need for the mortgage, the release of the same, or of the quitclaim deed. As a consequence, these instruments were delivered to the Raferts.

Kenneth testified that when he visited Tony in December 1954, Tony told him that he had given Helen the 80 acres of land in York County, and that he had to do this in order to enable Helen's daughter to go to school in York County. At that time Tony gave Kenneth bonds of the maturity value of $9,000, as heretofore mentioned, and told Kenneth: "I want you to have these before I die, some of our bonds. I want

you to have some of our bonds before I die. I feel if I turn that land to Helen she may not give it back."

After Kenneth had received the bonds of the maturity value of $9,000 in December 1954, he was taken to the depot in Columbus to meet a train for the purpose of returning to Spokane. Ervin, Helen, and Don Rafert, and Tony took Kenneth to Columbus. While waiting for the train, Ervin visited with Kenneth and stated that it was none of his business how much Kenneth got in the settlement made by Tony with him, but he wondered how they arrived at the figure. Kenneth told Ervin that they had "taken the number of acres into the number of bonds and divided it and arrived at a figure." Kenneth stated that he had received his rent.

Don Rafert testified that he was present at that time when his father commented to Kenneth in a joking manner that: "Usually prospectors come out of the hills with money. I hear you are taking money back into the hills." He also heard his father ask Kenneth about the settlement that was made between Kenneth and Tony, and Kenneth said that he would tell Ervin about it. This witness, not being interested, then walked away. At that time this witness was 19 or 20 years of age.

George H. Bond, who was acquainted with Tony during his lifetime and visited him on occasions, testified that a day or two after Kenneth had returned to Spokane he visited with Tony at Tony's home. Tony told this witness that he had made a settlement with Kenneth.

After the farm sale, which was held in 1944, the 160 acres owned by Tony and Kenneth were rented by John, Elmer, and Paul Tuepker, and they farmed it until 1952. Due to some difficulty relating to consolidating of schools, Tony would not commit himself as to whether he would lease the land to these tenants for the following year. Elmer Tuepker called Kenneth by telephone and received a reply that Tony was managing

the place and making the decisions with reference to what should be done in renting it. In July 1952, the Tuepkers received notice to quit the premises, signed Kenneth Dunbier by Tony Dunbier, his agent. Robert, Don, and Harley Rafert planted wheat on this land in 1952, and farmed it from that time on. Robert got married and moved to Shelby to rent other land.

The record shows that Don and Harley Rafert helped Tony in many ways. They brought fuel to his home, helped overhaul his porch, fixed a drain in his home, laid linoleum, mowed his lawn, drove him to town to transact business, and would shave Tony most of the time. Often Tony and the Rafert boys would eat out, and Tony would pay for their meals, and sometimes Tony paid for their services. In 1952, Don drove Tony to Tucson, Arizona, for a vacation trip, and Tony paid all of the expenses.

The record further shows that Tony thought very much of the Rafert boys. He said they were thrifty and good hustlers. He always spoke well of the boys and said that they had been real good to him and came over every day to see how he felt.

In the spring of 1955, Robert, Don, and Harley Rafert entered into a contract to purchase the Hines farm. Robert was later released from the contract. The purchase price of the Hines farm was $40,000. Don and Harley Rafert had arranged for a loan with the Federal Land Bank, and a down payment of $6,000 was made when the contract was signed. When Tony heard that the Rafert boys were about to purchase the Hines farm he offered to loan them the money. In July 1955, Don and Harley, their parents, and Tony went to the office of an attorney in York for the purpose of making a settlement for the Hines farm. Don and Harley paid $14,000 on the balance, and Tony paid $20,000. In return, Tony took a note from the Rafert boys in the amount of $20,000, bearing interest at 4 percent per annum, and a mortgage was drawn for a period of 10

years securing the same, which was given by the Rafert boys. At that time Tony told the attorney that he had cashed some bonds because he wanted to help the boys. The cost of drawing the note and mortgage was paid by the Rafert boys, and no interest was paid on the mortgage by the makers. The mortgage was placed of record July 15, 1955. After the boys had purchased the Hines farm, an irrigation well was put on the place, pipe was purchased, and land leveled. Tony had a conversation with the boys as to how much they could pay, and said he would pay the rest of the cost of the land leveling. Tony also purchased some corncribs because he wanted the corn covered. The amount advanced by Tony in April 1956 for the above items appeared to be as follows: For the leveling of the land $900; for the corncribs about $1,000; and $5,323 for irrigation equipment and pipe.

Late in 1956, Tony told Harley Rafert that he and Don had done a lot for him and he was going to give them the Hines farm. On December 10, 1956, Tony contacted Don and Harley and wanted them to drive him to Stromsburg. Arriving at Stromsburg, Tony contacted his attorney, and requested the attorney to draw a release of the mortgage on the Hines farm. Prior to that time, on November 26, 1956, Tony executed his last will in this attorney's office, and at that time he told his attorney that he wanted to do something for the Rafert boys and would do it in his lifetime. The release was executed and acknowledged before the attorney.

Foy Rosenberry testified that Tony told him he was going to give his share of the Hines farm to the boys because they had been good to him. Tony told Alva Hecht that he was going to see to it that the boys were taken care of.

There is evidence in the record offered by the plaintiff to the effect that Tony, in his later years, and especially in the year 1956, was mentally incompetent to

transact business, was under the influence of Helen and the Rafert family generally, and was unduly influenced in cashing bonds and assisting the Rafert boys in the manner as heretofore set out. We have examined this record and find that there is an abundance of competent evidence that Tony was mentally competent in assisting the Rafert boys as heretofore shown. In addition, Tony was mentally competent to make his last will and testament in November 1956. The witnesses who testified with reference to the negotiations involving the Hines farm, the last will and testament of Tony, and the cashier of the Stromsburg bank who cashed bonds for him, testified that he was mentally competent at all times. There is evidence to the effect that there was no change in Tony's mental condition although physically he might have been weaker.

The plaintiff contends that, being a co-owner of the bonds in suit, he could not be deprived of his property rights therein through the acts of his co-owner, therefore, he was entitled to follow the proceeds of the bonds into the hands of the defendants who had received the same without consideration.

The bonds in question were registered in the names of Tony Dunbier or Kenneth Dunbier. The words "or survivor" were not used. Three of the bonds were listed Tony Dunbier or Kenneth Dunbier POD, meaning payable on death.

The plaintiff asserts that no matter how the co-ownership occurred, whether by gift or by contract, it did not lie within the legal capacity of Tony to deprive the plaintiff of his co-ownership rights by cashing the bonds and turning the proceeds over to the defendants.

The plaintiff, in his pleadings, alleged that he acquired these bonds pursuant to a partnership agreement. It appears that in this court he also contends that the bonds were acquired by Kenneth as a gift from Tony. It is apparent that the plaintiff has injected a theory other than that which he pleaded and presented to the

trial court, and is now asking this court to consider, in addition to Kenneth acquiring the bonds by a contract, whether or not Tony made a gift of the bonds to Kenneth.

In the case of Callahan v. Prewitt, on rehearing, 143 Neb. 793, 13 N. W. 2d 660, this court said: "Except as to questions of jurisdiction, questions not presented to nor passed on by the trial court will not be considered on appeal." See, also, Lash v. Erisman, 167 Neb. 606, 94 N. W. 2d 32.

With reference to the bonds of the type here being considered, this court in Rohn v. Kelley, 156 Neb. 463, 56 N. W. 2d 711, considered series G government bonds which were made out to Mrs. Florence Hendricksen or Mrs. Ethel Kelley. In other words, they were coowners of bonds which had a maturity value of $10,000. Ethel Kelley cashed six of the bonds prior to the death of Florence Hendricksen and four thereafter. This court said: "The government's interest is a contractual one. Its obligation was to pay either of the co-owners the amount agreed upon as shown by the bonds upon their proper presentation, in compliance with the federal law." Series G and series E government bonds fall into the same category, as each series are savings bonds.

In Littlejohn v. County Judge, Pembina County, 79 N. D. 550, 58 N. W. 2d 278, 39 A. L. R. 2d 690, the court was considering United States savings bonds, series E and G, registered in the names of two persons as coowners. The court said: "Savings bonds of the series involved in this case may be registered in the names of two persons as co-owners and, * * * a bond so issued will be paid to either co-owner upon his request without the signature of the other."

In Yocum v. Yocum, Com. Pl., 46 Sch. Leg. Rec. 164 (Pa.) it was said that ownership of series E bonds (series E bonds are the ones considered in the instant case) is governed by United States law and treasury

regulations, which provide that during the lives of both co-owners the bonds will be paid to either co-owner upon his separate request without requiring the signature of the other co-owner, and upon payment to either co-owner the other person shall cease to have any interest in the bond. See, also, Paulsen v. Paulsen, 144 Me. 155, 66 A. 2d 420; Ruben v. Ruben, Com. Pl., 95 Pittsb. Leg. J. 65; 91 C. J. S., United States, § 126, p. 316.

In order to be entitled to the proceeds of the bonds in question, the plaintiff has the burden to prove by a preponderance of the evidence that he was entitled to such proceeds by virtue of a contract between Tony and Kenneth.

The plaintiff contends that the existence of the contract alleged by plaintiff and plaintiff's ownership of the bonds in suit were admitted by the defendants' pleadings.

The defendants' answer stated in substance that they lacked information sufficient to form a belief as to the nature of the arrangement that the decedent and the plaintiff had in regard to the plaintiff's rent. The answer then specifically denied the plaintiff's allegations in his petition relating to the partnership agreement or contract. The answer also stated that if a contract had been made on the terms alleged by plaintiff, the consideration running from the plaintiff to the decedent would be unconscionable, and a court of equity would not enforce it. By the amended answer, the defendants alleged that the written contract upon which the plaintiff relied as a partnership agreement was a forgery.

The contract alleged by the plaintiff was purported to be between the decedent and the plaintiff. The defendants would not know about the contract or the details of the same, nor could they be expected to know what it contained. All they knew was that the plaintiff claimed under a contract.

The plaintiff also argued that the defendants admitted

the contract by pleading that the decedent and the plaintiff argued over the indebtedness owing to the plaintiff by the decedent, including the income from the plaintiff's farm, and that the plaintiff was given $9,000 in satisfaction of an indebtedness owed by the decedent to the plaintiff. We believe the following to be applicable.

In Fitch v. Martin, 83 Neb. 124, 119 N. W. 25, affirmed on rehearing, 84 Neb. 745, 122 N. W. 50, the court said: "A plea of general settlement and payment of all claims and demands is not an implied admission that any specific cause of action existed in plaintiff's favor and against defendant during the time covered by that settlement, and is not inconsistent with a general denial."

As we have previously pointed out, the defendants, in their answer, specifically denied that there was a contract between the decedent and the plaintiff.

In Giacomini v. Giacomini, 163 Neb. 798, 81 N. W. 2d 194, this court said: "More than one defense may be interposed to the same cause of action, provided they are not inconsistent with each other; they are not inconsistent unless the proof of one necessarily disproves the other." See, also, Colbert v. Miller, 149 Neb. 749, 32 N. W. 2d 500; Blodgett v. McMurtry, 39 Neb. 210, 57 N. W. 985.

The plaintiff contends that the acquisition of the property in question by the defendants was obtained by undue influence and mental incapacity.

In an action to set aside an instrument on the ground of undue influence the burden is upon the plaintiff to prove by a preponderance of evidence, which as a whole is of such a substantial nature as to contain some competent and relevant proof of each and all of the following elements: (1) That the person who executed the instrument was subject to undue influence; (2) that there was opportunity to exercise undue influence; (3) that there was a disposition to exercise undue influence

for an improper purpose; and (4) that the result was clearly the effect of such undue influence. Undue influence cannot be inferred from motive or opportunity alone. There must be competent evidence, direct or circumstantial, to show that undue influence not only existed but that it was exercised. Mere suspicion, surmise, conjecture, or speculation is not enough to warrant a finding of undue influence, but there must be a solid foundation of established facts upon which to rest an inference of its existence. See Reynolds v. Knott, 164 Neb. 365, 82 N. W. 2d 568.

In order to set aside an instrument or instruments as contended for by the plaintiff in the instant case for want of mental capacity on the part of the person executing such instruments, the burden of proof is upon the party so asserting to establish that the mind of the person executing such instruments was so weak or unbalanced when the instruments were executed that he could not understand and comprehend the purport and effect of what he was doing. See, Lund v. Woodward, 137 Neb. 689, 291 N. W. 90; Marston v. Drobny, 166 Neb. 747, 90 N. W. 2d 408; Kucaba v. Kucaba, 146 Neb. 116, 18 N. W. 2d 645.

As stated in Sampson v. Sissel, 151 Neb. 521, 38 N. W. 2d 341, an action to set aside an instrument on the ground of undue influence: "This jurisdiction recognizes the right of an owner of property to convey his estate without consideration, or in other words to make a gift of it inter vivos. Newell v. Pierce, 131 Neb. 844, 270 N. W. 469; Smith v. Black, 143 Neb. 244, 9 N. W. 2d 193; Kellner v. Whaley, 148 Neb. 259, 27 N. W. 2d 183."

In First Trust Co. v. Hammond, 140 Neb. 330, 299 N. W. 496, in defining the elements necessary to constitute a gift inter vivos, it was said that there must be an intention to transfer title to the property, and a delivery by the donor and acceptance by the donee, and the transfer must be so complete that if the donor again resumes control over it without the consent of

the donee he becomes liable as a trespasser. See, also, Sampson v. Sissel, *supra*.

We fail to find any competent evidence that Tony was unduly influenced by his daughter Helen or the defendants, or that he was mentally incompetent at any time prior to his death. The plaintiff's contention in this respect cannot prevail.

The next question that arises relates to the defendants' affirmative defense that the contract between the decedent and plaintiff, relied upon by the plaintiff, is a forgery.

Winsor C. Moore, an examiner of questioned documents and a professor at law, testified in behalf of the defendants that he examined exhibit No. 1, which is the purported contract between the decedent and the plaintiff. He had examined checks which purported to show the genuine signature of Tony, dated in 1940, 1941, and 1942, for the purpose of making a comparison of those genuine signatures with the signature on the contract. He was unable to arrive at a conclusive opinion as to whether or not the true signature of Tony appeared on the contract. He then took into consideration the question of whether or not the ink appearing on the contract was actually in existence in 1941, and made tests to determine this fact. He observed a glowing fluorescence which indicated that the ink had symptoms of containing what is known as "R.C. 35," an additive put into ink by the Sheaffer Pen Company beginning in February 1955. He concluded, or could only say, that the ink on the instrument had the trace or symptoms of R.C. 35, but his examination was not conclusive, as he was not an ink chemist.

Robert S. Casey, who was a specialist and a qualified expert on inks, examined exhibit No. 1, the contract. He explained that R.C. 35 is a substance, or one of a number of substances, that have the property of adhering to the fibers of paper very strongly, being resistant to hypochlorite bleaches and of fluorescing,

giving off a light, when exposed to filtered ultraviolet light. The first production batches of R.C. 35 put into stock and shipped out were made in February 1955. He testified that he knew of no other ink company that had ever used any substance which reacted similar to R.C. 35 in their inks. This witness made demonstrations and tests before the court to disclose what he meant by R.C. 35 and its relation to the contract here being considered. He gave as his opinion that this contract could not have been written in 1941, because Sheaffer's Skrip did not contain R.C. 35 at that time, and his opinion was that the contract was not written in 1941.

On rebuttal the plaintiff produced a witness who testified that there were several hundred makes of ink, and that fluorescent materials had been available for many years. He was unable to tell what compounds were in the ink on the contract. On cross-examination he testified that he had seen inks that had fluoresced, prior to 1955.

It is apparent that the evidence is in conflict on this issue.

In the case of Renter v. Renter, 148 Neb. 776, 29 N. W. 2d 466, which involved a forgery on a will, this court held: "Testimony of handwriting experts that the signature on an instrument offered for probate as a will is not the signature of the alleged testator, if based on sound reasons and circumstances supporting that theory, may be sufficient to overturn the testimony of subscribing witnesses that they saw the will signed." See, also, In re Estate of O'Connor, 105 Neb. 88, 179 N. W. 401, 12 A. L. R. 199.

When an issue of forgery in a civil case is raised by pleadings and contested by evidence on both sides, there is no presumption either in favor of witnesses or in favor of circumstances. All of the evidential facts which throw light on the issue must be considered as to whether or not the instrument is genuine. If the truth is found in oral testimony, it must determine the issue, but it is

equally potent if found in circumstances. See, Bank of Commerce v. McCarty, 119 Neb. 795, 231 N. W. 34; Wert v. Equitable Life Assurance Society, 135 Neb. 654, 283 N. W. 506; Renter v. Renter, *supra;* In re Estate of O'Connor, *supra.*

As stated in Bank of Commerce v. McCarty, *supra:* "The mere opinion of witnesses who testify alone from familiarity with a signature and from comparing genuine and disputed writing has less weight generally on the issue of forgery than expert opinions based on scientific skill and sound reasons. * * * The result of comparisons made by handwriting experts is a character of evidence sanctioned by statute and merits proper consideration on the issue of forgery in a civil action."

We conclude that there was sufficient evidence on the issue of forgery to permit the trial court to pass upon this issue.

This case is for trial de novo in this court. However, we recognize the rule that the trial court heard and saw the witnesses as they testified. It had a better opportunity to appraise the credibility of the witnesses than does this court. The trial court resolved the conflicting evidence in favor of the defendants. While this court tries appeals in equity de novo, we must necessarily consider the findings of the trial court on matters that are in irreconcilable conflict. Jensen v. Manthe, 168 Neb. 361, 95 N. W. 2d 699; Marston v. Drobny, *supra.*

In the instant case, from the evidence heretofore set out, it is apparent that Tony intended to transfer the proceeds of certain of the bonds to the defendants as a gift. A delivery was made in the form as heretofore mentioned, and the defendants accepted the gift as Tony intended they should. He possessed mental capacity to make such a gift, and he was not unduly influenced in doing so. We find that the plaintiff failed to prove the alleged contract because the evidence shows it was a forgery. We also find that Tony and Kenneth had a complete settlement relating to the rent that

might be due Kenneth from his 80 acres of land, and all other matters that required settlement between them.

From an examination of the evidence and the authorities set forth herein, we conclude that the judgment of the trial court should be, and is hereby, affirmed.

AFFIRMED.